City of Valparaiso *v.* Hagen.

---

### CITY OF VALPARAISO *v.* HAGEN ET AL.

[No. 18,638.   Filed October 25, 1899.]

MUNICIPAL CORPORATIONS.—*Sewage.—Water Course.—Injunction.*— Equity will not restrain a municipality from discharging its sewage in a natural water course, where it acts in conformity to the statutes, skilfully and without negligence, though the waters are polluted to the injury of lower riparian proprietors, and where there is no other natural or reasonably possible means of drainage. *pp. 339-342.*

SAME.—*Sewage.—Damages.*—The act of a municipality in draining its sewage into a stream, thereby so polluting the waters of such stream that the pastures of a lower riparian proprietor are destroyed at flood time, is not such a taking of private property as must be preceded by just compensation. *p. 343.*

SAME.—*Sewage.—Eminent Domain.*—A municipality may exercise the right of eminent domain in securing an outlet for its sewage, but no such authority exists as will permit it to seize upon the stream and its margins to relieve consequential damages. *pp. 343, 344.*

From the Porter Circuit Court.   *Reversed.*

*A. D. Bartholomew,* for appellant.

*N. L. Agnew* and *D. E. Kelley,* for appellees.

HADLEY, J.—Valparaiso is a city of 8,000 inhabitants. Salt creek is a natural water course flowing from south to north through the western part of the city; thence west and north to its confluence with the Calumet river. Its fall is fifteen feet per mile, and its minimum volume 227 cubic feet of water per minute. Within the city limits on the southwest is a low-lying marsh that naturally drains into Salt creek. The natural and only practicable drainage for all the territory within the city limits is Salt creek.

Prior to 1896 the city had constructed, according to law, a general and complete system of sewerage for the city at a cost of $50,000, and 200 closets and 500 kitchens had been connected therewith; and the outfall from the entire system was into the marsh at the southwest, at a point about sixty-four rods from Salt creek. About 47,000 gallons of sewage are being daily discharged into the marsh. The marsh is heavily overgrown with grass and other vegetation, but sewage in some form finds its way into Salt creek and pollutes its waters. Above the point of sewage contact there are three slaughter houses that drain directly into Salt creek, and one rendering establishment and one gas works drain into near by tributaries. Nine-tenths of one per cent. of the water in Salt creek, below the sewer discharge in time of low water, is sewage coming from the city, the slaughter houses and other polluting agencies above.

Appellant is threatening and has arranged for an extension of the outlet directly through the marsh of Salt creek. The plaintiffs, nineteen in number, are the owners and occupants of lower lands abutting on Salt creek at distances from two to ten miles from and below Valparaiso. The action is for an injunction precluding the city from discharging sewage into Salt creek. The complaint sets forth the several interests of the plaintiffs in the subject-matter: That Salt creek, before the grievances mentioned, was a natural water course and a perpetually running stream of pure water flowing by and through the lands of the plaintiffs, and was used by them for domestic, agricultural, and dairy purposes; that defendant city has 8,000 inhabitants and is situate upon Salt creek at a point higher and up stream from the lands of the plaintiffs; that the city had theretofore constructed and put into use a large and complicated system of sewers and had permitted 500 houses and closets to be connected therewith; that the sewers were so constructed that they emptied all the sewage of the city into the marsh on the southwest, a short distance from Salt creek, and that the sewage, being dis-

charged in great quantities into the marsh, overflowed and ran into Salt creek, whereby the waters of the creek became polluted, filthy, and unwholesome, and the banks of the creek became lined and overflowed with sewage, slops, excremental filth, and garbage, and the lands of the plaintiffs contiguous thereto, and which were used for pasture, have been and are being overflowed by said substances, and the grass so befouled that the plaintiffs' stock will not eat it nor drink the water in the stream; that noxious odors arise from the stream and permeate the air for a half mile and injuriously affect the health and happiness of the plaintiffs and their families; that the city is threatening to and will accomplish an extension of the sewer through the marsh to Salt creek and there and thereby empty all the sewage of the city directly into Salt creek above the plaintiffs' lands, and there and thereby greatly increase the pollution of the water and render it unfit for any purpose, to the irreparable damage of the plaintiffs. Prayer, "that the city be enjoined forever from constructing said sewer outlet, or emptying the sewage of the city in the said stream or upon the said land at the place where it is now emptying, and from depositing the same into said creek at any point."

A demurrer to the complaint was overruled, and sustained to the second paragraph of answer. A trial was had upon the general issue, and finding and judgment perpetually enjoining the appellant from polluting or increasing the pollution of the waters of the creek by permitting its sewage to run into the waters of the stream.

Error is assigned upon the action of the court upon the demurrers, and upon the overruling of appellant's motion to modify the finding and for a new trial. But, as suggested by the appellant, each assignment raises but a single, and the same, question, and they will therefore be considered together. That question is: May a municipality, acting in conformity to the statutes, skilfully and without negligence or malice, pursuing the only natural and reasonably possible

line of drainage, be enjoined from discharging its sewage into a natural water course and thereby polluting its waters to the injury of the lower riparian proprietors?

It is a familiar principle that injunctive relief will not be granted if there exists a complete remedy at law, and, if the case falls within the class of *damnum absque injuria*, the denial is equally imperative. It is equally well established that every owner of land, through which a stream of water flows, is entitled to the reasonable use and enjoyment of the stream. His right to do so is not an acquired property right, but a natural right appurtenant to his freehold, and is in common and equal with all others owning land upon the stream. He may dam it and divert it for mechanical purposes and fish ponds if he will return it to its channel before leaving his premises; he may use it for purposes of agriculture; his animals may take water from it at will; he may clear away the forests, plant crops, fertilize his field, feed his animals in lots, and permit the storm water from his fields and feed yards to flow by natural ways into the stream; or he may collect the surface water upon his premises, if all upon the water shed into ditches, covered or uncovered, and clean or unclean, may direct them into the stream, even though such drainage corrupts the waters of the stream and sends them on to the owners of the servient estates less pure than he received them. His enjoyment is according to his position, superior to those below him and inferior to those above him.

The right to improve and beautify property and to employ all the reasonable methods afforded by the estate and its appurtenances, to protect the health and promote the comfort and happiness of self and family, is inseparably connected with the right to own and control property; and, though its exercise may sometimes injuriously affect others, the law affords no remedy. In acquiring estates and in erecting homes along water courses, notice must be taken of the conformation of the territory, the natural lines of

drainage, that farms, cities, and villages may gather along its banks, and that the impurities incident to the trades, to agriculture, and population, that fall upon the surface, will find their way into the stream and that the enjoyment of the stream is liable to be modified and abridged if not altogether suspended in many uses to which it might originally have been fitted, by those above in the exercise of their own equal rights.

A municipality in large sense is a riparian proprietor. Its officers stand for the corporation. They are empowered by the State to provide and enforce sanitary measures for the preservation of the health and welfare of the public. The corporation has the same right to exist as an aggregation, and to enjoy its possessions, as a natural person. It may under the law establish public halls, libraries, and market places; and it may lay out parks and embellish them with flowers and fountains for the comfort and happiness of the corporate body. It may open and improve streets, construct gutters, sluices and waterways, and if storm water carries into these latter the multifarious filth and garbage incident to populous places and bears the same away by natural channels to the general water course of the basin, the right of the municipality to permit it will not be doubted, even though the waters of the stream are thereby so polluted as to render them unfit for ordinary uses.

And wherein have the dwellers below ground of complaint? They have suffered only that which they should have reasonably expected and estimated in acquiring their property. The question is rooted in the natural law of self-preservation. And if cities are permitted to adulterate streams by allowing all accumulating surface impurities to flow into them by natural channels, we do not perceive why the underlying principle will not allow them to deepen these natural storm channels and transform them into covered sewers, nor why the right to protect the health and welfare of the public against one class of noxious matter should not

be extended to all classes of equal virulence. And, while action must be taken with a cautious regard for the rights of those below, it has come to be a scientific fact, generally accepted, that the minimum of mischief resulting from closet contents may be attained by an early dispatch through the medium of flowing water, wherein solids are dissolved and chemical action for purification speedily takes place. But, however this may be, there is back of the question sovereign power, resting upon reasons satisfactory to the legislature, conferred upon cities to construct sewers and outlets, and, by necessary implication, authority to discharge the sewage into the usual and naturally adapted conduits. The grant of such powers imposes the duty to exercise them in all needful cases.

This record shows that appellant is a city of 8,000 inhabitants; that between the years 1891 and 1896 the proper authority projected and constructed a complete system of sewers at a cost of more than $40,000, adopting for the outlet of the system the line of natural drainage for the district. It further appears that all parts of the city were ultimately drained into Salt creek within the city limits. And there is no pretense that there is any other possible outlet or practical means of disposing of sewage, or that the sewer was unskilfully or negligently constructed.

Hence, then, to forbid a discharge of sewage into Salt creek is to deny to the city the right to discharge it anywhere, and thus leave it without the ordinary means of sanitation. Surely it is not the law that a salutary statute, essential to the health and welfare of the public, may be thus nullified by exhibiting a damage to private right. The sewage must be dispatched or the city abandoned. The place adopted for the outpour is that provided by nature and can not be had elsewhere. The facts present a case wherein the principle of the greatest good to the greatest number must be permitted to operate, and private interest yield to the public good, and if the erection has been skilfully performed,

and without negligence, as is shown to be the fact by the record, and in a way to do the least mischief, it must be held to be a lawful exercise of power that equity will not restrain. *Barnard* v. *Sherley*, 135 Ind. 547, 24 L. R. A. 568; *City of Richmond* v. *Test*, 18 Ind. App. 482, 501; *Merrifield* v. *City of Worcester*, 110 Mass. 216.

That cities are not liable for consequential damages to private property resulting from the construction of streets, sewers, and other public improvements, when the work is skilfully executed and free from negligence, is no longer an open question in this State. *City of Terre Haute* v. *Hudnut*, 112 Ind. 542, and cases there cited; *City of Vincennes* v. *Richards*, 23 Ind. 381.

But appellees' counsel argues, on behalf of one of the appellees, that the waters of the stream in flood time carry the sewer filth out upon his pasture, whereby the grass is rendered worthless, and noxious odors are emitted to the annoyance and harm of appellee and his family, and that this is a consequential damage, not to his natural rights in the stream, but to his acquired property rights; and that it is a taking of his private property for public use without compensation first being rendered. The lessening of the value of an estate by a destruction of the grass and the creation of some personal discomfort has only the same protection of the law that is accorded to other forms of injury to property by municipal improvements, and it has been uniformly held in this State that such consequential damage is not such a taking of private property as must be preceded by just compensation. *Cummins* v. *City of Seymour*, 79 Ind. 491, 41 Am. Rep. 618; *Macy* v. *City of Indianapolis*, 17 Ind. 267; *City of Lafayette* v. *Spencer*, 14 Ind. 399; *Weis* v. *City of Madison*, 75 Ind. 241, 39 Am. Rep. 135; *City of Lafayette* v. *Bush*, 19 Ind. 326. See, also, *Commonwealth* v. *Alger*, 7 Cush. 53, 85.

It will not do to say that the stream, and appellees' land lying along the margins of Salt creek, should have been

condemned by the city, to the right to dispatch sewage along the stream, before proceeding to do so. According to the statement of appellant's counsel, the premises of appellees alleged to be affected are situate from two to ten miles by the stream from the corporate limits of the city; and, if the city is required to go so far to recompense sewage effect, "Where may it stop short of the sea?" Appellant had lawful authority to exercise the right of eminent domain in securing an outlet for its sewage, but no such authority exists as will permit it to seize upon the stream and its margins to relieve consequential damages. *City of Richmond* v. *Test*, 18 Ind. App. 482, 500, and authorities cited.

Furthermore, the construction of sewers and outlets is sanctioned by the law, and what the law grants will not constitute a nuisance *per se*, public or private. And, if the law is obeyed, no actionable wrong will result. In any instance, however, an action may arise from want of due care in construction or repairs. But it must be presumed that all ministerial officers will perform their official duty and cause no offense in their execution of the law. *City of Elkhart* v. *Wickwire*, 121 Ind. 331, 337. Hence, injunction will not lie to restrain the exercise of a power lawfully conferred, until the power has been abused to the injury of public or private right.

By the judgment appealed from, appellant is "permitted to extend its sewer system from its present outlet to Salt creek, but is perpetually enjoined and restrained from polluting or increasing the pollution of the waters of the creek." The judgment is anomalous in that it expressly authorizes appellant to construct the proposed extension through the marsh to Salt creek, but forbids forever the pollution of the waters of the stream. Ordinarily the right to extend the active operating sewer to Salt creek would carry with it the right to discharge the sewage, usually and necessarily carried by it, into the stream, which implies pollution of its waters; but the express prohibition must be held to preclude

the emptying of any corrupting substance into the creek. Whether the judgment is intended to operate against the situation as it now exists, and against the voiding of sewage into the marsh, whence it escapes into Salt creek, or to conditions that may exist if and after appellant has extended the sewer to the creek, is not clear, but if it relates to future conditions, as we have seen, injunction will not lie; and if to present conditions, the facts averred in the complaint and established by the evidence do not warrant it.

The complaint fails to aver the absence of skill or the want of due care, or that some other outlet could more reasonably be had, or that some other reasonable method of disposing of the city sewage is available; and, for reasons stated, it is insufficient to entitle appellees to the relief prayed. The demurrer to the complaint should therefore have been sustained. Judgment reversed, with instructions to sustain the demurrer to the complaint.