LOWE ET AL. *v.* INDIANA HYDRO-ELECTRIC POWER
COMPANY.

[No. 24,341.   Filed March 19, 1926.]

1. WATERS AND WATERCOURSES.—*Riparian owner of land on both
sides of non-navigable stream may use water therefrom for any
lawful purpose if it is permitted to flow off his land and thence
down stream as it would if stream had been left in natural
state.*—The owner of land on both sides of a non-navigable
stream and extending across it has the right to use the water
flowing over his land for any lawful purpose if the water, after
being so used, is permitted to flow off his land and thence down
the stream substantially as it would if the watercourse had
been left in its natural state and so as not to damage the
landowners farther down the stream.   p. 436.

2. EMINENT DOMAIN.—*Writ of ad quod damnum was available
only to riparian owner desiring to erect a mill operated by
water power or to one damaged by the erection of a dam to
operate such mill.*—The ancient writ of *ad quod damnum* was
only available to one who owned the land on one side of a
watercourse on which he desired to erect a mill or other ma-
chinery propelled by water power, or to a person damaged by
the construction of a dam to operate such a mill or machinery.
p. 436.

3. WATERS AND WATERCOURSES.—*Legislative grant of right to
erect a dam across a non-navigable stream on land embracing
a damsite not necessary where it would not materially retard
the flow of stream nor materially damage others.*—A legis-
lative grant of the right to use the flowing waters of a non-
navigable stream to operate machinery was not necessary in
order to enable the owner of lands embracing a damsite to
erect a dam thereon which would not materially retard the flow
of the stream nor cause material damage to the land of others.
p. 436.

4. EMINENT DOMAIN.—*Company organized to manufacture,
transmit, distribute and sell electric current to the public has
the right to condemn land which will be overflowed by erection
of its dam across non-navigable stream.*—A company organized
under Acts 1907 p. 277, §§5533-5543 Burns 1926, for the manu-
facture, transmission, distribution and sale of electric current
to the public, having acquired a damsite on a non-navigable
stream, has the right to condemn lands for flowage by its dam.
p. 438.

5. EMINENT DOMAIN.—*Electric light and power company may
appropriate lands and easements necessary to carry on the
purposes for which it was organized without securing declara-*

*tion by Public Service Commission of convenience and necessity as required by Acts 1921 p. 216, §§12805-12807 Burns 1926.*—The act of 1921 (Acts 1921 p. 216, §§12805-12807 Burns 1926) empowering the public utilities enumerated therein to condemn lands and easements, after securing from the Public Service Commission a declaration that public convenience, economy or necessity required such appropriation, is limited to the public utilities enumerated therein and is not applicable to an electric light and power company organized under the act of 1907 (Acts 1907 p. 207, §§5533-5543 Burns 1926), and hence it is not necessary for a company incorporated under the latter statute to obtain a declaration by the Public Service Commission of public convenience, economy or necessity before condemning lands for its purposes. p. 438.

6. EMINENT DOMAIN.—*Lease to other public utilities of electricity manufactured by an electric light and power company organized to furnish electric current to the public would not affect its right to exercise power of eminent domain.*—The fact that an electric light and power company had entered into contracts with other public utility corporations by which it leased to them the electricity to be manufactured by its plant would not affect its right to exercise the power of eminent domain to secure an easement in lands necessary to the operation of its plant. p. 440.

7. EMINENT DOMAIN.—*Operation of machinery by water power to manufacture electricity to be sold to the public generally, is public use for which lands may be appropriated.*—The operation of machinery by water power to manufacture electricity to be sold to the public constitutes a public use for which lands may be appropriated under the power of eminent domain. p. 441.

8. EMINENT DOMAIN.—*Evidence as to the relative benefits and damages resulting from the erection of a dam in a river not admissible in hearing on application for appointment of appraisers in eminent domain proceeding to condemn easement for flowage above the proposed dam.*—In the hearing on an application for the appointment of appraisers in an eminent domain proceeding to condemn an easement for flowage above a dam proposed to be erected, evidence as to the relative benefits and damages resulting from the proposed dam is not admissible, as it would not prove or disprove any issue involved. p. 441.

9. EMINENT DOMAIN.—*Evidence held sufficient to sustain inference that plaintiff was owner of damsite on which it was proposed to construct dam for which petitioner sought easement of flowage.*—Evidence held sufficient to sustain the inference

which the trial court drew that the plaintiff in an eminent domain proceeding was the owner of a damsite on which it was proposed to construct a dam and for which the petitioner asked for the appointment of appraisers to condemn an easement of flowage.   p. 442.

10.   EMINENT DOMAIN.—*Evidence held sufficient to sustain inference that electric company was organized under Acts 1907 p. 277, §5533 et seq. Burns 1926 and would engage in business by which the water power developed by its dam would be devoted to public use.*—Evidence *held* sufficient to sustain inference that electric company, seeking to appropriate lands for the construction of a dam, was incorporated under Acts 1907 p. 277, §5533 et seq. Burns 1926, although the preamble to the articles of association recited that the incorporation was under the statute providing for the organization of corporations for manufacturing and mining purposes, and also sufficient to sustain an inference that it proposed to engage in a business by which the water power developed by its dam would be devoted to a public use.   p. 442.

11.   APPEAL.—*Appellate tribunal will not weigh the evidence, nor, if evidence sufficient to sustain finding of trial court, determine whether it would have justified contrary decision.*— An appellate tribunal will not weigh conflicting evidence on an issue of fact, nor, if there is evidence justifying the finding of the trial court, determine whether the evidence would have justified a decision the other way.   p. 445.

12.   EMINENT DOMAIN.—*Evidence held sufficient to sustain inference that electric company had endeavored to buy land sought to be condemned but had been unable to do so.*—Evidence *held* sufficient to sustain inference that electric company, seeking to appropriate lands needed in the construction of a dam, had endeavored to buy from the owner the real estate sought to be condemned, but had been unable to agree with him as to the purchase price.   p. 445.

13.   EMINENT DOMAIN.—*Wife and tenants of landowner are not "owners" so as to require an effort to purchase their interests before commencing appropriation proceedings.*—The wife and tenants of a landowner are not "owners" of land sought to be condemned so as to require that an effort be made to purchase their interests before commencing a proceeding to condemn the lands for a public use.   p. 445.

From Tippecanoe Circuit Court; *Charles W. Moores,* Special Judge.

Condemnation proceedings by the Indiana Hydro-electric Power Company against Harry Lowe and others.

From an order appointing appraisers, the defendants appeal. *Affirmed.*

*James W. Noel, Thomas F. Gaylord, Addison K. Sills, Jr., Clarence R. Cowger, Hubert Hickam* and *Alvan W. Boyd,* for appellants.

*Mote & Goodrich, Emory B. Sellers* and *Stuart, Simms & Stuart,* for appellee.

EWBANK, C. J.—This was an action by the appellee seeking to appropriate the right of flowing certain lands by the erection of a dam in the Tippecanoe river. The lands belonged to the appellant Harry Lowe and Grace Lowe was made a party because of being his wife, while Oscar Gano and Lloyd Welty were also joined, as being tenants having a temporary right to possession of the lands sought to be taken. Overruling certain objections in the nature of demurrers to the complaint, sustaining demurrers to certain objections filed by way of answer, and appointing appraisers to assess the damages after the evidence was heard, are assigned as errors.

The amended complaint alleged, in substance, that the plaintiff is an Indiana corporation organized under an act authorizing the formation of companies for the manufacture and sale of electricity for heating, lighting and power purposes, to towns and cities and to the public, and defining their powers (§5533 *et seq.* Burns 1926, Acts 1907 p. 277), and the acts amendatory thereof and supplemental thereto; that plaintiff's principal place of business is in the city of Indianapolis, State of Indiana, and it is the owner of a power and damsite abutting upon the Tippecanoe river in White county, Indiana, in a designated quarter section, on which it is proposing to erect a dam across the river, and that it is now taking steps toward the erection and completion of a dam and power house for the purpose of

manufacturing electricity to be sold to cities and towns and to the public generally, for heating, lighting and power purposes; that under the laws of the State of Indiana, it possesses the authority to exercise the power of eminent domain; that the defendant Harry Lowe owns certain lands, describing them, and the construction and maintenance of said dam will cause the water of the river to overflow part of his said lands, and the plaintiff desires to appropriate and to have condemned an easement for overflowage purposes in a certain described portion of his said lands, and to possess the same for flowage purposes; that the said lands so sought to be appropriated and condemned are necessary for carrying out the purposes for which the plaintiff was organized; that the defendant Grace Lowe is the wife of said owner, and each of the other defendants is a tenant on said lands, and is claiming some right, title or interest in and to them by reason of such tenancy; that plaintiff has endeavored to purchase said real estate sought to be condemned from the owner but has been unable to agree with him for its purchase. The complaint concluded with a prayer that appraisers be appointed to assess the damages to which the owner of said real estate will be entitled by reason of such appropriation and condemnation, and that an easement in and to the lands described and sought to be condemned be vested in plaintiff for overflowage purposes.

The tenants, Gano and Welty, filed objections to the effect only that, by reason of facts stated, they would suffer damage from such condemnation. The defendants, Harry Lowe and his wife, jointly filed a large number of objections, some of which presented issues of law by way of demurrers to the complaint, and others tendered issues of fact. All of the objections tendering issues of law were overruled, and each appellant reserved an exception to each ruling. Demurrers were

sustained to each of a number of the objections tendering issues of fact, and again each appellant reserved an exception to each ruling. The issues of fact joined on the complaint and the answers to which the court did not sustain demurrers were tried by the court without a jury, and appraisers were appointed to assess the damages. In the course of the trial, a large number of objections were made to different items of evidence introduced by the plaintiff, and exceptions were reserved to the action of the court in admitting such evidence; and many items of evidence were offered to be introduced by the defendants to which objections were sustained, and they reserved exceptions to those rulings. Appellants complain that each of a great many different rulings to which they excepted was erroneous, but the questions of law presented by their exceptions are not so numerous.

The questions for decision are:    (1) Whether the ownership of a damsite extending across the river, together with incorporation under the act of 1907, gave plaintiff the right to condemn lands which would be overflowed by the erection of a dam on said lands that it already owned, to develop water power for the purposes for which it was organized; (2) whether §§12805, 12806, 12807 Burns 1926, Acts 1921 p. 216, made it unlawful for plaintiff to appropriate lands under the power of eminent domain without first securing from the Public Service Commission of Indiana a declaration that public convenience, economy or necessity required such appropriation and condemnation; (3) whether a lease given by plaintiff to other public utilities covering the use of all the electricity to be developed from its dam would take away whatever right it might otherwise have to appropriate these lands; (4) whether the court could inquire into the relative benefits and damages that will result from the proposed dam and mill

pond in order to determine if the particular enterprise will or will not be of public utility; (5) whether there was evidence sufficient to prove that plaintiff owned the land on which it was proposing and preparing to build its dam; (6) whether there was evidence sufficient to prove a negotiation and attempt on the part of plaintiff to purchase the interest in the lands which is sought to be condemned, and that plaintiff was unable to agree with defendants for its purchase; and (7) whether there was evidence sufficient to prove that plaintiff is a corporation organized under the act of 1907 and is proposing to engage in a business by which the water power developed by its dam will be devoted to a public use.

(1) The Tippecanoe river is a non-navigable stream. And an owner of lands lying on both sides of such a stream and extending across it has the right, at

1-3.   common law, to use the water of the stream flowing over his land to turn mill wheels or for any other lawful purpose, if the water, after being so used, is permitted to flow off his land and thence down the stream substantially as it would if the watercourse were left in its natural state, and so as not to damage the owners of property farther down the stream. *City of Valparaiso* v. *Hagen* (1899), 153 Ind. 337, 340, 54 N. E. 1062, 48 L. R. A. 707, 74 Am. St. 305; *Barnard* v. *Sherley* (1893), 135 Ind. 547, 558, 559, 24 L. R. A. 568, 41 Am. St. 454; *Taylor, Admr.,* v. *Fickas* (1878), 64 Ind. 167, 172, 31 Am. Rep. 114; *Dilling* v. *Murray* (1855), 6 Ind. 324, 325, 326, 327, 63 Am. Dec. 385; *Mentone Irr. Co.* v. *Redlands, etc., Co.* (1909), 155 Cal. 323, 327, 100 Pac. 1082, 22 L. R. A. (N. S.) 382, 17 Ann. Cas. 1222; *Jones* v. *Tennessee Coal, etc., Co.* (1918), 202 Ala. 381, 80 So. 463; *McDonough* v. *Russell-Miller Milling Co.* (1917), 38 N. D. 465, 165 N. W. 504; *Hetrich* v. *Deachler* (1847), 6 Barr (Pa.) 32;

Angell, Watercourses (7th ed.) §§93a, 95, 483a; Gould, Waters (3d ed.) §§204, 208, 213; Farnham, Waters and Water Rights §465, pp. 1577, 1578.

The ancient writ of *ad quod damnum* was only available to a person who already owned the land on one side of the watercourse on which he desired to erect a mill or other machinery propelled by water power, or to a person damaged by the construction of a dam to operate such a mill. §883 R. S. 1881, 2 R. S. 1852, §684, p. 188, Laws Indiana Territory 1807, pp. 192-199.

The right to erect a dam and to use the water always has been derived from riparian ownership, possessed and acquired, and the writ was only necessary in case the construction of a dam, mill pond and race would take from an owner, or affect the value of, property which belonged to others than the owner of the mill, and only for the purpose of assessing the damages to such property, and, by payment of the damages assessed, making the continued injury or use of that property lawful. If the plaintiff in the instant case was seeking or threatening to consume the waters of the Tippecanoe river, or to turn them aside by means of ditches and tunnels, so that they would water the valley of the Iroquois or Kankakee river, and would no longer flow in the channel of the Tippecanoe, a different question would be presented, to which authorities cited by appellants' brief might be applicable. But it clearly appears in this case that the dam which appellee proposes to erect and maintain will merely retard the flow of water in the river to the extent of filling the pond it creates, after which, the water will flow over and past the dam and down the channel of the river as before, except that a portion of it will pass through certain mechanical devices in flowing down from the level to which the dam has raised it, and thereby will cause machinery to operate. A legislative grant of the right

to use the flowing waters of the stream for that purpose was not essential in order to give the owner of lands embracing a damsite the right to make such use of them, so far as it could be done without damage to others.

The act of 1907 authorizes the formation of corporations "to carry on the general business of the manufacture, transmission, distribution and sale of electric current to towns and cities and to the public in general, for heating, lighting and power purposes, and for the carrying on of all business incident thereto." §5533 Burns 1926, Acts 1907 p. 277, §1. And it provides that every company organized under its provisions, for the purpose of enabling it to fulfill the objects of its formation, is "empowered and authorized to acquire, build, construct, own, maintain and operate all necessary and convenient lands * * * dams * * * and other things and devices, and to this end to appropriate and condemn lands * * * or any easement in any such lands necessary to the carrying out of its objects," etc. §5540 Burns 1926, Acts 1907 p. 277, §8. If incorporated under this act for the purpose authorized, as the complaint alleged it was, the plaintiff company, having established itself in a mill-site for the purpose contemplated by the statute, had the right to condemn lands for flowage by its dam. *Miller* v. *Southern Ind. Power Co.* (1916), 184 Ind. 370, 374, 375, 111 N. E. 308; *Illyes* v. *White River Light, etc., Co.* (1911), 175 Ind. 118, 121, 93 N. E. 670.

(2) By the express provisions of the act of 1907, that act applied only to corporations organized for the purpose of producing electricity and distributing it to cities and towns and to the general public, and it only authorized the appropriation of lands outside of cities and towns. The last section provided (and, as amended, still provides) that "no con-

demnation shall ever be made by virtue of this act of any lands lying within the corporate limits of any city or town." §5542 Burns 1926, §1, ch. 104, Acts 1909 p. 276, amending §10.

In 1921, an act was passed purporting to empower public utilities of many kinds to appropriate and condemn lands and easements, wherever situated, after having secured from the Public Service Commission of Indiana, following a public hearing, a declaration that public convenience, economy or necessity requires such appropriation. But the grant of this authority was expressly limited to public utilities of the kinds therein enumerated, "except in cities of the third class," thus excluding from the operation of the statute all public utility companies in the cities of Anderson, Kokomo, Logansport, Lafayette, Marion, New Albany, and Richmond, to which it would apply if such companies were doing business anywhere else in the state. The second section provided that: "No such public utility shall be authorized to appropriate and condemn lands or easement in lands *under and by virtue of this act* without first securing from the Public Service Commission, a declaration," etc. And the third section stated that: "This act shall be construed as supplemental legislation, and not as repealing any laws now in force." §§12805, 12806, 12807 Burns 1926, §§1, 2, 3, Acts 1921 p. 216.

Appellee insists that this act of 1921 is unconstitutional, for various reasons. But we do not find it necessary to pass on the constitutional question thus presented. The act expressly provides that it shall not be construed as repealing any laws then in force, but as supplemental only. And it is limited by its express terms to forbidding the appropriation of lands without first obtaining a declaration from the Public Service Commission that public convenience, economy or necessity requires such appropriation, in case a public

utility seeks to appropriate.and condemn lands or easements "by virtue of this act." Construed as supplemental legislation which does not repeal any laws already in force, the act of 1921 does not apply where there is other legislation, previously in force, under which the plaintiff can and does appropriate and condemn the lands it needs. But the scope of that act (if valid) is limited to public utilities not within the provisions of the act of 1907, or of some other law in force at the time the act of 1921 was passed, and to lands which, by reason of lying within the corporate limits of a city or town, or for some other reason, could not be appropriated by a public utility of the class to which the acts previously enacted apply, under laws already in force when the act of 1921 was passed. And since the authority conferred by the act of 1907 made it unnecessary to show that plaintiff was, "authorized to appropriate lands or easements under and by virtue of this act" of 1921, there was no necessity for obtaining a declaration by the Public Service Commission, after a hearing, that public convenience, economy or necessity required such appropriation and condemnation.

(3) The mere fact that the plaintiff, a public utility corporation, had entered into lawful contracts with other public utility corporations by which it had leased to them portions or all of the output of electricity to be manufactured by its plant, did not affect its right to exercise the power of eminent domain. If it should try to avoid performance of its public duties, performance could be compelled by mandamus. And so long as those duties are performed, it is not material that the electricity manufactured by plaintiff at its plant may be distributed, sold and furnished to cities and towns and to the public generally through the agency of. lessees, instead of directly. *Matlock* v. *Bloomington Water Co.* (1925), 196 Ind. 271, 146 N. E.

852; *State, ex rel.,* v. *Superior Court* (1908), 52 Wash. 196, 202, 100 Pac. 317, 21 L. R. A. (N. S.) 448; *Glaser* v. *Glenwood R. Co.* (1903), 208 Pa. 328, 57 Atl. 713.

(4)  That the purpose for which the plaintiff was organized, of operating mill wheels driven by water power and thereby manufacturing electricity and selling it to cities and towns and the public generally for heating, lighting and power purposes, constitutes a public use for which lands may be appropriated is firmly established, and is not open to question. *Sexauer* v. *Star Milling Co.* (1910), 173 Ind. 342, 347, 351, 90 N. E. 474, 26 L. R. A. (N. S.) 609; *Illyes* v. *White River Light, etc., Co., supra; Miller* v. *Southern Ind. Power Co., supra.* And it was clearly shown, without dispute, that the flowage of appellant's lands was necessary in case the river was to be dammed to the height contemplated, so as to create the water power as planned. Nor do we understand that appellants challenge these propositions. But they insist that the trial court had power and was charged with the duty to inquire into the comparative benefits and injuries to the public which will result from this particular enterprise, if completed as designed, and from a consideration of such facts, to determine whether the proposed dam, so far from really being of benefit to the public, would be detrimental to the health, life and prosperity of that part of the public immediately affected. And, to this end, they offered to introduce evidence tending to show that constructing a dam of the height proposed and causing the water of the river to overflow the low lands on either side in the manner as planned would interfere with the drainage of lands in the basin which drains into the river and create swampy conditions detrimental to the health of people living near the pond so created. Thus, they offered to prove by Dr. Hurty, in answer to hypothetical questions, that a pond such

as they claim the proposed mill pond will be, will contain stagnant water from which offensive odors and malaria will be disseminated over a considerable area; and to show by the testimony of Mr. Moore that damming the water of the river will obstruct the outlets of public ditches which drain a great many acres. And excluding this evidence on objections by plaintiff is specified as error. Evidence somewhat similar has been held competent on the question of damages, where appeals had been taken from awards by the appraisers, after their appointment and an assessment by them of defendant's damages. *Southern Ind. Power Co.* v. *Miller* (1916), 185 Ind. 35, 36, 111 N. E. 925; *Southern Ind. Power Co.* v. *Monical* (1915), 183 Ind. 588, 109 N. E. 763. But no such issue is presented by a petition for the appointment of appraisers. Such a petition presents only the questions: (a) Whether the property appropriated is sought to be taken for a use that is so far public that the legislature has power, under the Constitution, to authorize the appropriation of property for such a use; (b) whether the legislature has conferred upon the plaintiff, by a general law or otherwise, within its constitutional authority, the power to appropriate for that use the particular property sought to be taken; and (c) whether the plaintiff has proceeded and is proceeding in conformity with the law in exercising the power so conferred. The offered evidence did not tend to prove or disprove any of the matters thus put in issue, and was properly excluded.

(5) Plaintiff introduced evidence to the effect that the site of the proposed dam is on the Tippecanoe river, about 800 feet upstream from the wagon bridge at the village of Norway, in section 21, township 27 north, range 3 west, in White county, Indiana; that the Tippecanoe Hydraulic Company and the Tippecanoe River Electric Company had deeded to plain-

tiff a tract of land extending for three-quarters of a mile along both sides of the Tippecanoe river, embracing the damsite, and the entire channel of the river and both its banks for a considerable distance above and below; that a dam had been built substantially on that site before the year 1860, and had been maintained and the water used by successive owners to operate machinery in mills of different kinds until about the year 1904, when the dam washed out, though remnants of it still remained in the river; that the Norway Pulp Company occupied this property and operated a pulp mill thereon with water collected by the dam there for several years, and was in possession during that time; that by deed dated June 28, 1904, the Norway Pulp Company conveyed the land to Bradner Smith and Company; that both of these companies were dominated by Bradner Smith, and, during a number of years, he operated mills of different kinds on this property with water collected by said dam; that by deed dated November 28, 1904, Bradner Smith and Company conveyed said real estate to Arthur McKain, and he went into possession and operated a feed mill thereon for a time; that by deed dated April 26, 1905, he and his wife conveyed these lands to the Tippecanoe Hydraulic Company, and a man had supervision of it for that company, thereafter; that both Bradner Smith and Company and the Norway Pulp Company occupied the land immediately above and below the present dam and on both sides of the river; that Arthur McKain was in possession of these lands between the period when they were in possession of Bradner Smith and Company and the time when the Tippecanoe Hydraulic Company and the Tippecanoe River Electric Company had possession—that he was in possession about a year; that McKain organized the Tippecanoe Hydraulic Company, and by deed executed April 26, 1905, he and his wife conveyed the lands to

said company, which spent $50,000 on a proposed dam
there and afterward conveyed them to plaintiff, as
stated above; that, at the time of the trial, plaintiff was
in possession, and was engaged in building a dam there-
on, substantially at the site of the old dam.    This evi-
dence is sufficient to support the inference which the
trial court drew that plaintiff was the owner of the
damsite on the Tippecanoe river, on which it proposed
to construct a dam to develop power, as alleged in the
complaint.

(6) Plaintiff introduced in evidence a certificate of
the secretary of state that the plaintiff company, on the
day the certificate was issued, had incorporated with an
authorized capital stock of $10,000 in accordance with
the act of 1907 and the various acts amendatory thereof
and supplemental thereto, the title of the act being re-
cited in the certificate.    It also read in evidence articles
of incorporation prepared in strict conformity with sec-
tion two of the act of 1907 (§5534 Burns 1926), and
proved that a certified copy of such articles of associa-
tion was recorded in the office of the county recorder
of Marion county, Indiana, two days after the articles
were filed in the office of the secretary of state.    The
preamble of these articles recited that the subscribers
thereto associated themselves for the purpose of carry-
ing on the general business of the manufacture, trans-
mission, distribution and sale of electric current to
towns and cities, and to the public in general, for
heating, lighting, and power purposes and for carrying
on all business incident thereto.    And the body of the
articles recited that:  "The objects and purposes of
said company are to carry on the general business of
the manufacture, transmission, distribution and sale of
electric current to towns and cities, and to the public
in general, for heating, lighting and power purposes and
for the carrying on of all business incident thereto, and

to acquire, build, construct, own, maintain and operate all necessary and convenient lands, buildings, structures, dams, machinery, poles, wires and other things and devices, and to acquire and hold water and flowage rights; to acquire, lease, hold or occupy lands and the use of, or easements therein. All to the extent that may be necessary or desirable in carrying out the purposes and objects of the company." Plaintiff also introduced evidence that it had caused a map and profile to be prepared, with drawings, for the construction of a dam at the site in question, marking thereon the tracts of land which the dam would cause to be overflowed, and that the dam was now being constructed in accordance with said plans. It also proved that its grantor had prepared drawings and a profile and spent $50,000 in building a dam, but was prevented from finishing it by financial difficulties. There was also evidence that plaintiff had purchased the fee simple title to a large number of tracts of land within the basin which would be overflowed by the construction of the proposed dam.

This evidence is sufficient to support the inference drawn by the court that plaintiff is a corporation organized under the act of 1907, and is proposing to engage in a business by which the water power developed by its dam will be devoted to a public use. Appellant points to certain facts that were in evidence, including the fact that the preamble of the articles of association recited that the incorporators, in associating themselves together did so, "desiring and intending to form a corporation under and in accordance with the provisions of the laws of the State of Indiana, providing for the organization of corporations for manufacturing and mining purposes, and all other acts of the General Assembly of the State of Indiana amendatory thereof, supplemental or related thereto." And that there was evidence tending to prove that the

plaintiff did not intend, in good faith, to perform its public duties in carrying out the purposes for which its articles of association stated it had been incorporated. But this court will not undertake to weigh conflicting evidence in order to determine whether or not the trial court correctly decided an issue of fact. And having found that there was evidence which, if believed by the trial court, was sufficient to justify it in finding for plaintiff on this point, we shall not examine the evidence to the contrary nor undertake to determine whether or not it would have justified a decision the other way.

(7) It was shown by undisputed evidence that the defendant Harry Lowe was the sole owner of the lands sought to be condemned, that Grace Lowe had no interest therein except as his wife, and that the only interest of the defendants Gano and Welty arose out of the fact that each of them was a tenant of Harry Lowe, holding under a lease some portion of the lands sought to be taken, Gano's lease being for the term of one year, which would expire within a few weeks after the cause was tried and actually did expire before the appraisers were appointed, ·and Welty's for a term which would expire one year later. And a witness who testified that he was the chief engineer of the plaintiff company and had made a survey of the lands within the contour lines above the dam, testified that, by direction of the general manager and board of directors of the plaintiff company, that he should negotiate with Harry Lowe for the purchase of his said lands, witness asked him to sell for the company all the lands affected by the improvement at Norway that he owned; that the general manager had told witness to proceed and secure this land with the utmost diligence; that for answer to what witness said, defendant Lowe told him if he should buy the lower place, he would have to buy the entire

place at $125 an acre, and that $300 an acre would not be enough for the home place. That, at the time of this conversation, the contour lines had been run and the stakes set with respect to the lower farm and the two-acre piece; that witness met Mr. Lowe and offered him $80 an acre; that he had several other conversations with Mr. Lowe, talked to him several times on the streets, and met him in his office; that after the conversation in which Mr. Lowe said he would have to buy the entire place at $125 an acre, witness called him on the telephone to discuss the matter, and Mr. Lowe said: "If you cannot give any more than you have offered, there is no use for me to come down." And that witness reported to the attorney for plaintiff that he could not agree. This evidence sufficiently supports the inference drawn by the trial court that plaintiff had endeavored to buy from the owner the real estate sought to be condemned, but had been unable to agree with him for its purchase. And no matter how much evidence there may have been to the contrary, or which tended to deny the authority or the good faith of this witness in making such negotiation, the finding of the trial court that such was the fact is binding on appeal, as this court does not weigh conflicting evidence. Where an attempt to purchase the lands from the owner had proved unsuccessful and he had refused to negotiate further, and it had become apparent that the right to overflow the lands could not be acquired without an action to condemn them, it was not necessary, before beginning such an action, that an effort be made to purchase the interests of the owner's wife and his tenants, who had no power by any conveyance or contract they might execute to vest in the plaintiff any right to use the lands for the purpose desired, however willing they might be to sell. It is the "owner or owners" with whom the plaintiff must show himself unable

to agree. And the wife of an owner, having a mere inchoate interest as such wife which might never ripen into title, or a tenant, having merely a possessory right for a term of a few months, not being able by voluntary conveyance to give plaintiff any right to overflow the lands it was seeking to acquire, neither of them was an "owner" with whom it was necessary to negotiate before bringing suit to appropriate the lands, after a negotiation and attempt to purchase from the man who owned them had proved unsuccessful.

The judgment is affirmed.