## FOUNTAIN PARK COMPANY v. HENSLER ET AL.[*]

[No. 24,535.   Filed February 25, 1927.]

1. CONSTITUTIONAL LAW.—*Classification of subjects of legislation is primarily for the legislature and courts will not interfere unless such classification is manifestly unjust or unreasonable.*—The question of classification of subjects on which to legislate is primarily for the legislature and does not become a judicial question unless it clearly appears that the legislative classification is not based on substantial distinctions with reference to the subject-matter or is manifestly unjust or unreasonable.   p. 101.

2. CONSTITUTIONAL LAW.—*Subjects to be considered in determining legality of legislative classification.*—In determining the legality of a legislative classification of subjects for legislation, the subject to be regulated, the character, extent and purpose of the regulation, the classes of persons or corporations legally and naturally affected by the regulation should all be considered.   p. 101.

3. CONSTITUTIONAL LAW.—*Classification of subjects for legislative action must be reasonable and natural and not capricious or arbitrary.*— In order to avoid conflict with the constitutional provisions in reference to the equal protection of the laws (U. S. Constitution, 14th Amendment, State Constitution, Art. 1, §23), a legislative classification must be reasonable and natural and not capricious or arbitrary. Arbitrary selection or mere identification cannot be justified by calling it classification.   p. 101.

4. CONSTITUTIONAL LAW.—*Characteristics which may serve as basis of legislative classification.*—The characteristics which can serve as a basis of a valid classification of subjects for varying legislation must be such as to show an inherent difference in the situation and subject-matter of the subjects placed in different classes which peculiarly requires and necessitates different or exclusive legislation with respect to them.   p. 102.

5. CONSTITUTIONAL LAW.—*Proper classification defined.*—A proper classification of persons as the subject of legislation must embrace all who naturally belong to that class, and there must be some natural and substantial difference germane to the subject and purposes of the legislation between those within the class included and those to whom it is not applied.   p. 102.

6. CONSTITUTIONAL LAW.—*Statute conferring power of eminent domain on certain Chautauqua associations hold invalid because of arbitrary classification.*—Section 4903 Burns 1926 (Acts 1923 p. 172), conferring upon any Chautauqua association which has been in continuous existence for 15 years, has been giving annual programs lasting at least 16 days, and which has held a lease on timber land for fifteen years, the power of eminent domain to acquire the leased land on which it has been holding its assemblies, being intended to apply to one corporation alone, is invalid, as violating the Fourteenth

[*]Reported, 50 A. L. R. 1518.

Amendment to the Federal Constitution and Art. 1, §23 of the State Constitution.   p. 104.

7. CONSTITUTIONAL LAW.—*Statute conferring power of eminent domain on certain Chautauqua associations held invalid because special legislation.*—Section 4903 Burns 1926 (Acts 1923 p. 172), conferring the power of eminent domain on certain Chautauqua associations, specifically described, is in conflict with §23, Art. 4, of the state Constitution prohibiting local and special legislation and also in conflict with Art. 4, §22 requiring general laws to be of general and uniform operation.   p. 106.

8. CONSTITUTIONAL LAW.—The power to construe the Constitution is a judicial power.   p. 106.

9. EMINENT DOMAIN.—*Source of the power of eminent domain.*—The power of eminent domain does not depend for its existence upon any constitutional provision, but is an attribute of sovereignty inherent therein as a necessary and inseparable part thereof.   Consequently, the constitutional provisions regarding the power of eminent domain are not grants of power, but limitations upon the use of the power which would otherwise be without limit.   p. 107.

10. CONSTITUTIONAL LAW.—*Constitution prohibits taking private property for private use.*—The section of the Constitution which prohibits the taking of private property for public use without compensation, (Art. 1, §21, Constitution, §73 Burns 1926), by necessary implication, prohibits taking private property for private use.   p. 108.

11. EMINENT DOMAIN.—*Private property can only be appropriated for public use.*—Although the words "public use" do not appear in the section of the Constitution relating to the power of eminent domain (Art. 1, §21 state Constitution, §73 Burns 1926), private property can only be appropriated under the right of eminent domain when such appropriation is for a public use.   p. 108.

12. CONSTITUTIONAL LAW.—*Expediency of taking private property for public use is exclusively for the legislature.*—All questions relating to the expediency of taking private property for public use are exclusively for the legislature and not for the courts, but the courts may determine whether a proposed use is public or private.   p. 108.

13. EMINENT DOMAIN.—*Where statute authorizes exercise of power of eminent domain for private benefit, the courts should intervene.*—Whether a statute which authorizes the exercise of the power of eminent domain in a particular instance violates the constitutional provision against the taking of property for a private use is a question for the courts, and if it clearly appears that the use to which the property is to be appropriated is wholly private, the courts should intervene.   p. 109.

14. EMINENT DOMAIN.—*Term "public use" defined.*—The term "public use" may be generally defined as a use of property that affects the public generally, or any number thereof, as distinguished from particular individuals.   p. 110.

15. EMINENT DOMAIN.—*Characteristics of public use.*—It is essential to a public use that the general public have the right to a definite and fixed use of the property appropriated, not as a mere matter of favor or by permission of the owner, but as a matter of right; and if the special benefit to be derived from the lands sought to be appropriated is wholly for private persons, the use is a private one, and is not made a public use by the fact that the public will receive an incidental benefit therefrom.   p. 110.

16. CONSTITUTIONAL LAW.—*Statute giving certain Chautauqua associations power of eminent domain held void because purpose was not public.*—Section 4903 Burns 1926 (Acts 1923 p. 172), conferring on Chautauqua associations of a specified class the power of eminent domain to acquire land on which they have been holding their assemblies is void, for the reason that it attempts to confer that power on private corporations for purchases not constituting a "public use," contrary to Art. 1, §21, Constitution (§73 Burns 1926), and not withstanding Art. 8, §1, Constitution, which makes it the duty of the legislature to encourage moral, intellectual and scientific improvement.   p. 116.

From Jasper Circuit Court; *George A. Williams,* Judge.

Proceeding by the Fountain Park Company to appropriate certain land of Christian Hensler for a Chautauqua Assembly, to which the latter filed objections. From a judgment sustaining the objections, the plaintiff appeals.   *Affirmed.*

*Hanley & Hanley* and *Fraser & Isham,* for appellant. *Gaylord & Sills,* for appellees.

MARTIN, J.—The General Assembly on March 2, 1923, passed the following act:

"That any voluntary association organized and incorporated for the purpose of establishing, conducting and maintaining a religious chautauqua or assembly which has had a continuous legal existence for a period of not less than fifteen years, during all of which period of time such voluntary association has held, operated and conducted a religious chautauqua or assembly, giving an annual program covering a period of not less than sixteen days during each year, and has held a lease on a

tract of timber land for a period of not less than fifteen years, is hereby endowed with the right of eminent domain insofar as the same may be necessary for the purpose of acquiring possession in the corporate name of such voluntary association of the tract of land on which such voluntary association holds a lease and on which the religious chautauqua or assembly operated and conducted by such voluntary association is held, not exceeding forty acres in area. Any voluntary association which by the provisions of this act is endowed with and authorized to exercise the right of eminent domain for the purposes hereinbefore prescribed, shall proceed in compliance with the provisions of an act entitled, 'An act concerning proceedings in the exercise of eminent domain,' approved February 27th, 1915." Acts 1923 p. 172, §4903 Burns 1926.

On August 22, 1923, the appellant, a corporation organized under the general incorporation laws of this state, brought this action to take and hold, by the right of eminent domain, twenty-nine and eighty-seven hundredths (29.87) acres of land in Jasper county. The complaint sets out facts that bring appellant within each of the qualifying provisions of the law, describes the tract of wood or timber land which it holds under a lease and seeks to condemn, alleges that it cannot agree with the owner on a price and asks for the appointment of appraisers, etc., in accordance with the act providing for the procedure in eminent domain cases.

Christian Hensler, the owner, filed objections in writing setting forth grounds or reasons why the prayer of the complaint should be denied. Upon the death of Christian Hensler, appellant filed its supplemental complaint making his heirs at law and the administrator of his estate parties defendant. The appellees, who are the defendants substituted for the deceased owner of the land, refiled the objections and by agreement of the parties and on order of court, the objections were made

to apply to the supplemental complaint as well as to the original complaint as amended.   The trial court being of the opinion that the objections were well taken, sustained the same and as the plaintiff refused to plead further, pronounced a judgment for defendant at plaintiff's costs.   The appellant assigns as error the action of the court in sustaining the objections.

Two principal propositions were presented by the objections with relation to the constitutional validity of the act of 1923 upon which this proceeding is founded: *first*, that the act is void because the attempted classification of Chautauqua companies therein is arbitrary and not founded upon any reasonable basis, and constitutes that sort of "class legislation" which is forbidden by both the State and Federal Constitutions, and *second*:   that the act is void because it attempts to confer the power of eminent domain upon a private corporation to take private property for purposes which do not constitute a public use.

The provisions of the Federal and State Constitutions by which the validity of the *classification* feature of the act will be measured are as follows:   " . . . No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the *equal protection of the laws.*"   U. S. Constitution, Amendment Fourteen, §1. "The general assembly shall not grant to any citizen or *class* of citizens *privileges* or immunities which upon the same terms shall not *equally* belong to *all* citizens." Indiana Constitution, Art. I, §23, Bill of Rights, §75 Burns 1926.   "The general assembly shall not pass *local or special laws* in any of the following enumerated cases."   Indiana Constitution, Art. 4, §22, §125 Burns 1926.   "In all cases enumerated in the preceding section . . . and in all other cases where a general law can be made applicable all laws shall be *general and of uniform operation throughout the State.*"   Art. 4, §23, Indiana

Constitution, §126 Burns 1926.

The basis of classification of companies to which the power of eminent domain is granted as set forth in the act under consideration is as follows: (1) It must be a voluntary association. (2) It must be organized and incorporated for the purpose of establishing, conducting and maintaining a religious Chautauqua or assembly. (3) It must have had a continuous legal existence for a period of not less than fifteen years. (4) It must have held, operated and conducted a religious Chautauqua or assembly during all of said fifteen year period. (5) It must have given an annual program during all of said fifteen year period. (6) Its annual program must have covered a period of not less than sixteen days during each of the fifteen years. (7) It must have held a lease on land. (8) Its lease must have been on a tract of timber land. (9) It must have held the lease for a period of not less than fifteen years. And the property which it is authorized to take under the act is as follows: (10) The tract of land must be one on which the voluntary association holds a lease. (11) The tract of land must be one on which the religious Chautauqua or assembly operated by such voluntary association is held; and, (12) The tract must not exceed forty acres in area.

The appellant contends that "by this act a *natural and reasonable* classification is made of Chautauqua societies for legislative purposes"; that the act applies to all that are in the class of appellant and that the class consists of those Chautauquas which have been proved to be permanent and past the experimental stage by having had a corporate existence and continuous record of service for fifteen years, and being substantial in that they devote sixteen days each year to the enlightenment of the people and permanent by abiding in one place for the fifteen-year period. It contends that the classifica-

tion of the land is natural, reasonable and inherent in the nature of the thing—no tract greater than forty acres; no land which at the time is in other use by the owner, and only woodland long occupied by the Chautauqua society under a lease.

The appellee maintains that the classification attempted in the act is nothing more than *an arbitrary selection,* is not based upon any principle of public policy or upon any differences which have a natural, reasonable and just relation to Chautauqua companies; that it is essential that the reason for the classification must inhere in the subject-matter and rest upon some reason which is natural and substantial and not artificial and that by the many arbitrary qualifications prescribed, all voluntary associations except the appellant company are excluded from the operation of the act.

The question of classification is primarily for the legislature and does not become a judicial question unless it clearly appears that the legislative classification

1. is not based on substantial distinctions with reference to the subject-matter, or is manifestly unjust or unreasonable. *Denny* v. *City of Muncie* (1925), 197 Ind. 28, 149 N. E. 639; *Koplovitz* v. *Jensen* (1926), 197 Ind. 475, 151 N. E. 390; *Maercker* v. *Milwaukee, etc., R. Co.* (1912), 151 Wis. 324, 139 N. W. 199.

In determining the legality of classification, the subject to be regulated, the character, extent and purpose of the regulation, the classes of persons or corpo-

2, 3. rations legally and naturally affected by the regulation should all be considered. One of the essential requirements in order that the classification may not violate the constitutional guaranty as to equal protection of the laws, is that it must be reasonable and natural and not capricious or arbitrary. 12 C. J. 1128-1130; 6 R. C. L. 373-386, and cases cited.

The law requires something more than a mere desig-

nation of characteristics which will serve to divide into groups. Arbitrary selection or mere identifica-

4. tion cannot be justified by calling it classification. *Gulf, etc., R.. Co.* v. *Ellis* (1896), 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; *Rosencranz* v. *City of Evansville* (1924), 194 Ind. 499, 143 N. E. 593; *McKinster* v. *Sager* (1904), 163 Ind. 671, 72 N. E. 854, 106 Am. St. 268, 68 L. R. A. 273. The characteristics which can serve as a basis of a valid classification must be such as to show an inherent difference in situation and subject-matter of the subjects placed in different classes which peculiarly requires and necessitates different or exclusive legislation with respect to them. *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 80 ·N. E. 529, 14 L. R. A. (N. S.) 418; *Selvage* v. *Talbott* (1911), 175 Ind. 648, 95 N. E. 114, 33 L. R. A. (N. S.) 973; *Hirth-Krause Co.* v. *Cohen* (1912), 177 Ind. 1, 97 N. E. 1; *Dixon* v. *Poe* (1902), 159 Ind. 492, 65 N. E. 518, 60 L. R. A. 308; *Billings* v. *Illinois* (1902), 188 U. S. 97, 23 Sup. Ct. 272, 47 L. Ed. 400; *Alexander* v. *City of Elizabeth* (1893), 56 N. J. Law 71, 28 Atl. 51, 23 L. R. A. 525; *State* v. *Sheriff of Ramsey County* (1891), 48 Minn. 236, 51 N. W. 112, 31 Am. St. 650; *State* v.˙ *McFarland* (1910), 60 Wash. 98, 110 Pac. 792, 140 Am. St. 909.

. A proper classification must embrace all who naturally belong to the class—all who possess a common disability, attribute or qualification and there must

5. be some natural and substantial difference germane to the subject and purposes of the legislation between those within the class included and those whom it leaves untouched. *Chicago, etc., R. Co.* v. *Westby* (1910), 178 Fed. 619, 47 L. R. A. (N. S.) 97; *Selvage* v. *Talbott, supra; Hirth-Krause Co.* v. *Cohen, supra; Kraus* v. *Lehman* (1908), 170 Ind. 408, ·83 N. E. 714, 84 N. E. 769; *Barrett* v. *Indiana* (1913), 229 U. S. 26, 57 L. Ed. 1050; *Seaboard Air Line* v. *Seegers* (1907),

207 U. S. 73, 28 Sup. Ct. 28, 52 L. Ed. 108; *Maercker* v. *Milwaukee, etc., R. Co., supra.* The legislature cannot take what might be termed a natural class of persons, split that class in two, and then arbitrarily designate the dissevered factions of the original unit as two classes, and thereupon enact different rules for the government of each. *State* v. *Julow* (1895), 129 Mo. 163, 31 S. W. 781, 50 Am. St. 443, 129 L. R. A. 257; *State* v. *Miksicek* (1910), 225 Mo. 561, 125 S. W. 507, 135 Am. St. 597.

In the case at bar, all Chautauqua companies, which, as such, possess common attributes and stand in like situation with relation to any public necessity that might exist for their obtaining a site, are split up and a sub-class—a very small sub-class of such companies, to wit: those which have existed and conducted meetings for sixteen days a year continuously for fifteen years and which have held a lease for all of said period on a tract of timber land—has been singled out as the recipient of the benefits conferred by the statute.

No attempt will be made to review nor even to cite all the Indiana cases on the subject of classification for legislative purposes. The cases are not without conflict in the application of the legal rules laid down, but the statement of the main rules has been fairly uniform and can well be illustrated by the opinion of the court in the case of *Bedford Quarries Co.* v. *Bough, supra.* The court there made a general statement of the law, supported by the citation of many authorities, which is particularly applicable in the case at bar, and is as follows:

"The legislature may make a classification for legislative purposes, but it must have some reasonable basis upon which to stand. It is evident that differences which would serve for a classification for some purposes would furnish no reason for a classification for legislative purposes. Such legislation must not only operate equally upon all within the class, but the classification must

furnish a reason for and justify the making of the class; that is, the reason for the classification must inhere in the subject-matter, and rest upon some reason which is natural and substantial, and not artificial. Not only must the classification treat all brought under its influence alike, under the same conditions, but it must embrace all within the class to which it is naturally related. Neither mere isolation nor arbitrary selection is proper classification."

We can see no necessity for, nor propriety of, different legislation for a Chautauqua company that has operated sixteen days a year for fifteen years, than for one which has operated fourteen days a year for five years; for a Chautauqua company that has operated on a leased tract of woodland for fifteen years, than for one which operates in a city park or in a school yard or which owns a piece of prairie land. Such differences are not germane to the purpose of the law, which is to grant the right of eminent domain to Chautauqua companies. Leases and timber lands are merely property incidents and are not reasonable or natural differences upon which to base the legislative classification. The attempted classification does not embrace all those possessing the common attributes of the appellant company, and we believe it is capricious and arbitrary, can serve only to identify and not to classify, and that the act therefore is invalid.

Most of the cases hereinbefore cited have declared void the statutes containing improper classifications for the reason that they violate the equal protection clause of the federal Constitution. The provisions of state Constitutions prohibiting the granting of special privileges or immunities have been described as the antithesis of the Fourteenth Amendment to the federal Constitution,— one prevents the curtailment of the constitutional rights of citizens, and the other prohibits the enlargement of the

right of some in discrimination against others. If legislation, without good reason and just basis, imposes a burden on one class which is not imposed on others in like circumstances or engaged in the same business, it is a denial of the equal protection of the laws to those subject to the burden and a grant of an immunity to those not subject to it. Thus the particular laws granting special privileges and immunities must run the gauntlet of the provisions of the federal Constitution which secure the equal protection of the laws and those of state constitutions prohibiting either special legislation or special laws granting privileges and immunities. So long as all are treated alike under like circumstances, neither of these national or state provisions is violated. 6 R. C. L. 405, 406.

In *Davis Construction Co.* v. *Board, etc.* (1921), 192 Ind. 144, 132 N. E. 629, an act which sought to relieve "contractors engaged in bridge and highway construction" from consequences growing out of the increase of prices resulting from the World War, and to allow a cancellation of their contracts, was declared invalid and in conflict with Art. I, §23 of the State Constitution. The act did not include all contractors, or all contractors of public work, but only the sub-class above noted. The court said:

"While some classification of the subjects of legislative action is necessary, and a reasonable classification based upon actual differences which inhere in the different subjects and embrace all within the class and the reason for the classification will be upheld, a classification, to be valid, must be based on substantial distinctions which make one class so different from another as to suggest the necessity for different legislation with respect thereto. An artificial, arbitrary, and unreasonable classification, as by designating certain individuals by name or description out of a larger number

whose situation and needs do not differ from theirs, is forbidden by the Constitution."

It may not be impossible for companies other than appellant to come within the classification made in this act, but it is improbable that there will ever be 7, 8. many, if any at all, that can come within its narrowed and limited provisions. The legislative history of the act, Indiana House Journal, 1923 session, p. 297, shows that the bill for the act was introduced by the representative from the county in which the appellant company is located; this action was begun within a few months after the law was enacted, and it is quite apparent that the act was intended by its author and by the general assembly which enacted it, to apply to this one corporation alone. This would invalidate the act. *School City of Rushville* v. *Hayes* (1904), 162 Ind. 193, 70 N. E. 134; *Rosencranz* v. *City of Evansville, supra.* Article 4, §23 of the Indiana Constitution, read in connection with §22 same article, provides that local and special laws shall not be enacted where a general law of uniform operation throughout the state can be made applicable. From the consideration already given the law here in question, we conclude that it was special, that a general law of uniform operation could have been made applicable, and that, therefore it violates this section of the Constitution. The following recent cases have considered the constitutionality of laws under this section. *Koplovitz* v. *Jensen, supra; State* v. *Wiggam* (1918), 187 Ind. 159, 161, 118 N. E. 684; *Cox* v. *Timm* (1914), 182 Ind. 7, 13, 105 N. E. 479; *Railroad Comm., etc.,* v. *Grand Trunk, etc., R. Co.* (1913), 179 Ind. 255, 262, 100 N. E. 852; *Hirth-Krause Co.* v. *Cohen, supra,* pp. 8, 9, 10, 13; *Bullock* v. *Billheimer* (1911), 175 Ind. 428, 437, 94 N. E. 763; *Chandler Coal Co.* v. *Sams* (1908), 170 Ind. 623, 628, 85 N. E. 341; *Indianapolis St. R. Co.* v. *Robinson* (1901), 157 Ind. 232, 235, 61 N. E. 197; See, also, *Rosen-*

*cranz* v. *City of Evansville, supra;* and *Cain* v. *Allen* (1906), 168 Ind. 8, 15, 79 N. E. 201, 896. We are not unmindful of the older line of cases following *Gentile* v. *State* (1868), 29 Ind. 409, where it was said "that it is for the legislature alone to judge whether a law on any given subject not enumerated in §22 can be made applicable to the whole state," but most of those cases, while they quote the language of the Gentile case, can be distinguished by their facts from the case at bar. The act here in question purports to be a *general,* and not a special law, and the *dicta* of those cases cannot change the rule of law that the power to construe the Constitution is a judicial power. The present legislative tendency toward special and local legislation under the guise and verbiage of general laws should be checked by the legislature itself, or, by the courts, if it fails to do so; otherwise the body of the law will soon revert to the chaotic condition which existed under the old Constitution of 1816 described in *Indianapolis St. R. Co.* v. *Robinson, supra,* quoting from *Reed* v. *State* (1859), 12 Ind. 641, 648.

The second of the principal questions involved here concerns the validity of the act, dependent upon whether it attempts to confer the power of eminent domain upon a private corporation for purposes which do not constitute a public use.

The power of eminent domain does not depend for its existence upon any constitutional provision because it is an attribute of sovereignty inherent therein as 9. a necessary and inseparable part thereof, *United States* v. *Jones* (1883), 109 U. S. 513, 3 Sup. Ct. 346, 27 L. Ed. 1015; *Posey Tp.* v. *Senour* (1908), 42 Ind. App. 580, 86 N. E. 440; or is a reserve right vested in the state, subject to the right of the public to demand its use when necessary for the general benefit. *Cincinnati, etc., R. Co.* v. *City of Connersville* (1908), 170 Ind. 316, 83 N. E. 503; judgment affirmed, 218 U. S. 336, 31 Sup. Ct.

93, 54 L. Ed. 1060; *Vandalia R. Co.* v. *Lafayette, etc., Traction Co.* (1911), 175 Ind. 391, 94 N. E. 483. Constitutional provisions regarding the power of eminent domain are therefore not grants of power but limitations upon the use of the power which would otherwise be without limit. *Boom Co.* v. *Patterson* (1878), 98 U. S. 403, 25 L. Ed. 206; *Kohl* v. *United States* (1875), 91 U. S. 367, 23 L. Ed. 449; *Water Works Co.* v. *Burkhart* (1872), 41 Ind. 364; *Consumers Gas Trust Co.* v. *Harless* (1892), 131 Ind. 446, 29 N. E. 1062; Lewis, Eminent Domain (3d ed.) §10.

The federal and state Constitutions, limiting this power, provide: " . . . Nor shall any state deprive any person . . . of property, without due process of law." U. S. Constitutional Amendment Fourteen, §1—Rights of Citizens—Due process. " . . . No man's property shall be taken by law without just compensation; nor except in the case of the State without such compensation first assessed and tendered." Constitution Indiana, Art. I—Bill of Rights, §21, §73 Burns 1926.

The constitutional inhibition against taking private property for public use without compensation, by necessary implication prohibits taking private property for private use, 20 C. J. 548 and cases cited; and a taking for private use . . . is also a deprivation of property without due process of law. 10 R. C. L. p. 17, and cases cited. Although the words "public use" do not appear in the Indiana Constitution, it has always been held that private property can only be appropriated under the right of eminent domain when such appropriation is for a public use. *Water Works Co.* v. *Burkhart, supra; Wild* v. *Deig* (1873), 43 Ind. 455, 13 Am. Rep. 399; *Stewart* v. *Hartman* (1874), 46 Ind. 331.

All questions relating to the *expediency* of taking private property for public use are exclusively for the legislature, *Concord Railroad* v. *Greely* (1845), 17 N. H. 47; *Consumers Gas Trust Co.* v. *Harless, supra;*

*Richland School Tp.* v. *Overmeyer* (1905), 164 Ind. 382, 73 N. E. 811; *Speck* v. *Kenoyer* (1905) 164 Ind. 431, 73 N. E. 896; *Westport Stone Co.* v. *Thomas* (1911), 175 Ind. 319, 94 N. E. 406, 35 L. R. A. (N. S.) 646, and therefore when the public nature of a use—for which a taking has been determined as a political matter and authorized by law—is disputed, the question which presents itself to the courts is not whether the use is public, but whether the legislature might reasonably have considered the use to be public. The presumption being in favor of the legislative declaration, yet not conclusive, the courts will treat the decision of the legislature with consideration and will not interfere therewith unless the use is clearly and manifestly of a private character. 10 R. C. L. 29; 20 C. J. 551 and cases cited; *Westport Stone Co.* v. *Thomas, supra; Sexauer* v. *Star Milling Co.* (1910), 173 Ind. 342, 90 N. E. 474, 26 L. R. A. (N. S.) 609; *Mull* v. *Indianapolis, etc., Traction Co.* (1907), 169 Ind. 214, 81 N. E. 657; *Town of Rensselaer* v. *Leopold* (1886), 106 Ind. 29, 5 N. E. 761; *Strickley* v. *Highland Boy Mining Co.* (1906), 200 U. S. 527, 26 Sup. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174.

On the other hand, the question whether the constitutional provisions against the taking of property for private use have been violated is, like all constitutional questions, ultimately for the courts, and if a court can clearly see that a particular undertaking which it is proposed to clothe with the power of eminent domain has no real and substantial relation to the public use, it is the duty of the court to intervene. *Westport Stone Co.* v. *Thomas, supra; Sexauer* v. *Star Milling Co., supra; Town of Rensselaer* v. *Leopold, supra; Water Works Co.* v. *Burkhart, supra.*

No general or precise definition of the term "public use" or of what degree of public good will meet the constitutional requirement of that term can be framed, for,

in every case, it is governed by the question of public policy then and there prevailing,. but, in general, it may be said to cover a use affecting the public generally, or any number thereof, as distinguished from particular 'individuals. 20 C. J. 552; 10 R. C. L. 24. See Lewis, Eminent Domain (3d ed.) §§252-258.

It is also something more than public service, it must partake somewhat of a governmental attribute, otherwise hotels and similar private institutions, although they are completely bound to serve the public, would come within the definition.

The disagreement over the meaning of public use has centered over the proper synonym for the word "use." The text writers have attempted to divide the numerous cases on the subject into three classes or lines of decision, 10 R. C. L. 25, 20 C. J. 553-557, as follows: First: Cases which hold that "public use" means "use by the public", i.e. public employment wherein a duty devolves on the appropriator to furnish the public with the use intended, and the public is entitled as a matter of right to use the property taken. Second: Cases which hold that "public use" means public benefit, advantage or utility and is any use which tends to enlarge the resources, industrial energies or productive power of a number of the inhabitants of the state or contributes to the welfare and prosperity of the community. Third: cases which hold that the true definition lies somewhere between these two contending doctrines.

Howsoever the courts may decide on this matter throughout the Union, it seems to be well settled in Indiana that it is essential to constitute a public use that the general public have the right to a definite and fixed use of the property appropriated, not as a mere matter of favor or by permission of the owner, but as a matter of right; and if the special benefit to be derived from the lands sought to be appro-

priated is wholly for private persons, the use is a private one, and is not made a public use by the fact that the public has a theoretical right to use it, or that the public will receive an incidental or prospective benefit therefrom. *Mull* v. *Indianapolis, etc., Traction Co., supra; Great Western, etc., Oil Co.* v. *Hawkins* (1903), 30 Ind. App. 557, 66 N. E. 765. The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use, which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner. *Market Co.* v. *Railroad Co.* (1891), 142 Pa. 580.

The second of the three classes of decisions mentioned above has broken away from the first class by reason of a different public policy existing at the time or in the place of their decision. They have not usually been of the main class of takings, to wit, by the government or state to carry on its public functions and to conserve the safety and health of the public, or by municipal or private corporations to enable them to furnish the public with some required necessity or convenience, but have been takings by a private individual to enable him to cultivate his land or to carry on his business to better advantage, in a community so situated that public sentiment approves of such takings, either because they are sanctioned by ancient custom, or because the natural prosperity of the state would be seriously retarded if eminent domain could not be employed for such purposes. 10 R. C. L. 26. The largest number of such cases are doubtless those permitting the exercise of eminent domain for the purpose of irrigating land of a private owner decided in the western states of Arizona, California, Idaho, Montana, New Mexico, Utah, Washington and Wyoming and in Alaska. See Annotation in 9 A. L. R. 583.

Perhaps the most widely known case approving this

doctrine is *Clark* v. *Nash* (1905), 198 U. S. 361, 49 L. Ed. 1085. There the Supreme Court of the United States affirmed a decision of the Utah Supreme Court which held that on account of the peculiarly arid climate of Utah, where "agriculture is practically impossible without irrigation, the use of water, even by a private owner, for agricultural purposes, was a public use, and was of such value to the commonwealth that a statute permitting condemnation of the right of way for a ditch for the use of a private individual was not unconstitutional." The opinion, after saying that probably in most states the contention of plaintiff in error would be sound, proceeds: "Where the use . . . is founded upon some peculiar condition of the soil or climate, or other peculiarity of the state . . . we are always . . . strongly inclined to hold with the state courts, when they uphold a state statute providing for such condemnation. . . . But we do not desire to be understood by this decision as approving of the broad proposition that private property may be taken in all cases where the taking may promote the public interest and tend to develop the natural resources of the state."

When the proposed condemnation by a private individual of a site for a reservoir to irrigate his private land came before the Nebraska Supreme Court under a statute providing generally for the construction of storage reservoirs for irrigation, the court refused to adopt the view taken in the more arid western states. It reviewed the leading case of *Clark* v. *Nash, supra,* but pointed out the difference between the physical configuration and climatic conditions of the State of Utah and those of Nebraska, and while it admitted that "in the valleys of the extreme western portion irrigation is necessary to agriculture," it held that the operation of a general statute must cover the entire state, and that "there is no condition, there is no necessity, there is no prevailing

public opinion or sentiment or demand over the greater portion of the state for any such invasion of the right of private property." *Vetter* v. *Broadhurst* (1916), 100 Nebr. 356, 160 N. W. 109, 9 A. L. R. 578.

In Oregon, while the early cases sustained the legislative declaration that the use of water for purposes specified in the irrigation act was a public use, the court squarely refused to follow the arid state cases in the later case of *Smith* v. *Cameron* (1922), 106 Ore. 1, 210 Pac. 716, 27 A. L. R. 510, where individuals sought to compel the enlargement of a private irrigation ditch to irrigate private land. The court said: "If it is desirable as a matter of public policy that a private person may be permitted to condemn private property so that he can irrigate his own private land, the remedy is, . . . by an amendment to the constitution."

Early in the history of Indiana, the writ of *ad quod damnum* was authorized to enable the erection of dams across watercourses for "water grist, saw, carding or fulling mills." See R. S. 1843, p. 944. A review of our various mill statutes, beginning with the territorial law in 1807, is found in *Sexauer* v. *Star Milling Co., supra.* In *Hankins* v. *Lawrence* (1846), 8 Blackf. (Ind.) 266, this court recognized and sustained the right of the state to extend the power of eminent domain to persons engaged in operating grist mills to secure the land of others for the maintenance of dams for the operation of their mills, on the ground that such mills were of public utility. There is a long line of decisions following this case.

In nearly all of the older states, similar mill statutes were enacted. The grinding of corn was a public necessity, which could not well be accomplished in any other way; the miller was bound by law to grind for all who brought corn to his mill, and the rates he was permitted to charge were subject to regulation by law. A grist

mill under such conditions is clearly a public use, as it gives service to the public as completely as any of the public service corporations of the modern type. Accordingly such statutes were generally recognized as wholesome legislation; and were almost invariably supported by the courts, and even in more recent times, when conditions have changed so that water mills are no more a public necessity than any other form of private enterprise, the courts have felt bound to sustain the constitutionality of the mill acts on the ground that the long continued public acceptance of such statutes is almost conclusive in favor of their constitutionality. *Sexauer* v. *Star Milling Co., supra.*

In the case of *Zehner* v. *Milner* (1909), 172 Ind. 493, 87 N. E. 209, however, it was held that where a mill-dam was erected upon a site condemned for the purpose of operating "a grist mill" for toll, and the mill has since been operated as a commercial mill and not as a grist mill for toll, it has ceased to be of public utility, and the state in the exercise of its power of eminent domain may authorize the removal of such dam.

While thus the changing requirements of necessity and public policy have apparently cut down or eliminated the public character of some uses, they have caused other uses to become public, so that the operation of a mill by water power to manufacture electricity to be sold to the public generally now constitutes a public use for which lands may be appropriated, *Lowe* v. *Indiana, etc., Power Co.* (1926), 197 Ind. 430, 151 N. E. 220; *Miller* v. *Southern Ind. Power Co.* (1916), 184 Ind. 370, 111 N. E. 308; *Illyes* v. *White River Light, etc., Co.* (1911), 175 Ind. 118, 93 N. E. 670; and, as noted *infra*, the legislature has granted the power of eminent domain to cities and counties to construct aviation fields and for other public uses that a few years ago did not exist and were not thought of.

With all the general principles of law above reviewed in mind, we have carefully considered the nature of the use to which the property in this case would be devoted by the appellant chautauqua company.

Admitting the appellant's contention that, as a Chautauqua company, it is "one of the most prominent and useful societies devoted to the public service in teaching morality and justice and civil government, and widening the intellectual horizon of many thousand men, women and children—that it is engaged in a public service of the highest importance to the state," yet we cannot avoid the argument of appellee that "it cannot be insisted that every organization wielding a public benefit can be endowed with the power of eminent domain. If such be true, then churches, lodges, clubs, civic organizations, temperance organizations, theatres, circuses, public halls, . . . hospitals, homes for the aged and helpless, and orphans would all be entitled to be the recipients of such power, together with an endless chain that would know no bounds."

The state or government, possessing the sovereign power, has always taken for its use the property it needs. The State of Indiana has, by statute, delegated this power to the following public and private corporations: to cities and counties for aviation fields, to bridge companies, canal companies, to cities, towns and corporations operating public cemeteries, to cities for laying out and changing streets, to the state conservation department, to county commissioners for certain public buildings and monuments, to flouring mills for dams, to electric companies, gas companies, to the State Highway Commission and to counties for highways generally, to counties for general hospitals, to hydraulic and hydraulic power companies, to interurban electric railways, to oil companies for pipe lines, to railroads, to public school corporations, to stock yards companies, to street railroad companies,

to turnpike companies and to water-works companies, but in every such case, it seems that there has been a rule of necessity which required the power to be invoked.

As stated *supra*, the matter of what degree of public good or utility is necessary to constitute a "public use" is governed by questions of public policy and this is a matter which may vary at different times and places. We do not know what the rule of necessity or the demands of public policy may in the future require, but, at the present time in this state, we are sure that they cannot reasonably require that the sovereign prerogative of eminent domain be granted to Chautauqua companies to enable them to condemn a site for their meeting place. Their operation is not a matter of such great public concern as to necessitate their preference over churches, lodges, clubs, private schools and like organizations. Sites have always been procurable for all such institutions, and unless it is impossible for such companies to obtain sites by private contract and unless their operation is required as a matter of public policy, we cannot hold that their operation constitutes such a "public use" as will reasonably warrant the delegation by the legislature of the power of eminent domain.

Appellant has emphasized in its brief "the character, use and purpose, of Chautauqua Assemblies, as an aid to the dissemination of knowledge," and has pointed

16. out that Art. 8 (Education) of the State Constitution provides that "it shall be the duty of the General Assembly to encourage, by all suitable means moral, intellectual, scientific and agricultural improvement," to the end that knowledge and learning be generally diffused throughout the community. Granting that Chautauqua Assemblies do have a great and good influence on the educational as well as the religious life of the country by reason of their summer entertainments, lectures and schools, yet, by reason of the private

character of the appellant Chautauqua company, and in the absence of any showing that its meetings are for the whole public or that the general public has the right and the power to compel appellant to serve it, we cannot see that it is in any different situation from a private school. Private schools, though admittedly of value and use to the public, cannot be granted the power of eminent domain. *Connecticut College* v. *Calvert* (1913), 87 Conn. 421, 88 Atl. 633, 48 L. R. A. (N. S.) 485, and note p. 491.

Likewise corporations which conduct private cemeteries over which the public has no control and wherein the general public has not and cannot acquire an enforcible right to bury, and which dispose of lots on such terms and conditions as their proprietors see fit, cannot be invested with the power of eminent domain, as such use is not considered to be a public one. See Note: 22 L. R. A. (N. S.) 171.

Judgment affirmed.