FRANK A. RIDEN *v.* PHILADELPHIA, BALTIMORE & WASHINGTON R. R. CO.

[No. 28, October Term, 1943.]

*Decided December 14, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Marvin L. Anderson* and *J. Dudley Digges,* with whom were *Sasscer & Digges* on the brief, for the appellant.

*Charles T. LeViness,* with whom was *Edward E. Hargest, Jr.,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit for injunction was brought by Frank A. Riden, appellant, to restrain the Philadelphia, Baltimore & Washington Railroad Company from condemning a portion of his land in Prince George's County for a branch line to Bowie Race Track. The railroad company filed a demurrer to the bill of complaint. From a decree sustaining the demurrer and dismissing the bill, this appeal was taken.

It is a fundamental principle of constitutional law that the power of eminent domain is a prerogative of sovereignty and does not require the sanction of the Constitution for its existence in the State. *Moale v. City of Baltimore,* 5 Md. 314, 61 Am. Dec. 276; *United States v. Jones,* 109, U. S. 513, 3 S. Ct. 346, 350, 27 L. Ed. 1015; 29 *C. J. S., Eminent Domain,* Sec. 2. The Constitution of the State of Maryland, Art. 3, Sec. 40, declares that the Legislature shall enact no law authorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation. This provision is not a grant of power, but a limitation upon the exercise of power. *Mississippi & Run River Boom Co. v. Patterson,* 98 U. S. 403, 25 L. Ed. 206. Keeping in mind that the rights of personal liberty and private property are held sacred in our government, and the courts never assume that the people intend to relinquish rights so vital to their security and well-being by any general grant of legislative authority ·or any general expression of the will of the people (*New Central Coal Co. v. George's Creek Coal & Iron Co.,* 37 Md. 537, 559; *Wilkinson v. Leland,* 2 Pet. 627, 657, 7 L. Ed. 542, 553), we hold that this section of the Constitution unmistakably declares by implication that private property shall be taken only for public use and then only for just com-

pensation, and no private property shall be taken for private use, either with or without compensation, except with the owner's consent. Moreover, the taking of a man's property for the private use of another, even with just compansation, violates Article 23 of the Maryland Declaration of Rights, which declares that no man ought to be deprived of his life, liberty or property but by the law of the land. Likewise, the taking of private property for private use by authority of the State is a violation of the due process clause of the Fourteenth Amendment of the Constitution of the United States. *Fountain Park Co. v. Hensler*, 199 Ind. 95, 155 N. E. 465, 50 A. L. R. 1518; *O'Neill v. Leamer*, 239 U. S. 244, 36 S. Ct. 54, 60 L. Ed. 249; 12 *Am. Jur., Constitutional Law*, Sec. 560; 18 *Am. Jur., Eminent Domain*, Sec. 4. It follows that where an undertaking for which private property is sought by condemnation is intended for private use, the property owner can invoke the aid of a court of equity to restrain the unlawful condemnation. *Lynch v. Forbes*, 161 Mass. 302, 37 N. E. 437; *Reed v. City of Seattle*, 124 Wash. 185, 213 P. 923, 29 A. L. R. 446.

The inquiry in this case, therefore, is whether the contemplated branch line is for public use within the meaning of the Constitution. Of course, the Legislature cannot make a use public merely by declaring it so. Whether a particular use for which private property is sought is in fact public is ultimately a question for the determination of the court. *City of Richmond v. Carneal*, 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341; *Paine v. Savage*, 126 Me. 121, 136 A. 664, 51 A. L. R. 1194; *Shoemaker v. United States*, 147 U. S. 282, 13 S. Ct. 361, 390, 37 L. Ed. 170. Since the framers of the State Constitutions have seldom, if ever, definitely defined the term "public use," the courts have striven to formulate a uniform definition, but without success. The Court of Appeals of New York recently said: "Over many years and in a multitude of cases the courts have vainly attempted to define comprehensively the concept of a

public use and to formulate a universal test. They have found here as elsewhere that to formulate anything ultimate, even though it were possible, would, in an inevitably changing world, be unwise if not futile." *New York City Housing Authority v. Muller,* 270 N. Y. 333, 1 N. E. 2d 153, 155, 105 A. L. R. 905, 910. In some States the courts have held that the expression "public use" means public benefit, hence a use which has a tendency to develop the natural resources or increase the industrial power of a community, and thus contribute to the welfare and prosperity of the State. That definition, however, as Judge Pearce remarked in *Arnsperger v. Crawford,* 101 Md. 247, 253, 61 A. 413, 415, does not afford a definite criterion, as the judges are "left free to indulge their own views of public utility or advantage." In fact, the determination of this question by the courts in different States of the Union has been influenced by considerations in respect to the resources, the fertility of the soil, relative importance of industries to the public welfare, and the long established customs of the people. In all these respects the conditions vary so much in the different States that different conclusions might well be expected. *Hairston v. Danville & Western Ry. Co.,* 208 U. S. 598, 28 S. Ct. 331, 52 L. Ed. 637.

Often, too, as Judge Cooley pointed out, there are cases where it would obviously be for the public benefit if properties owned by certain individuals were in the hands of others so that dilapidated buildings could be replaced by better ones, and unsightly places beautified, for such improvements would give an aspect of beauty, thrift and comfort to the community, and thereby invite settlement, increase the value of land, and gratify the public taste; but certainly such a circumstance alone would not warrant expropriation of the properties from the owners. 2 *Cooley, Constitutional Limitations,* 8th Ed., 1131. So, if the term "public use" connotes public improvement, it is seriously questioned whether a sufficient limitation is set upon the power of eminent do-

main to guard the people from the possibility of an invasion of their constitutional right to acquire and possess property. *Bloodgood v. Mohawk & Hudson R. Co.*, 18 Wend., N. Y., 9, 65, 31 Am. Dec. 313, 356.

In this State we have held that the words "public use," as written in our Constitution, mean use by the public. We hold this view for three reasons: (1) It is the primary and more commonly understood meaning of the words. (2) At the time of the adoption of the second Constitution of 1851, the first of our organic instruments to contain a limitation upon the power of eminent domain, as well as the third Constitution of 1864, and our present Constitution of 1867, there was no practice in Maryland showing a contemporaneous construction that the term "public use" imported public benefit. (3) Our definition furnishes a more definite guide for the courts. *Arnsperger v. Crawford*, 101 Md. 247, 61 A. 413; *Dobler v. Mayor and City Council of Baltimore*, 151 Md. 154, 164, 134 A. 201; *Niles, Maryland Constiutional Law*, 192-201. It is our judgment that when the Legislature imposes a duty upon a corporation to serve the public without discrimination, and the State retains the power to regulate and control such service, and the corporation is liable to forfeit its franchise if it fails to perform its obligation to serve all the people alike, then the use is a public one. *Pennsylvania Mutual Life Insurance Co. v. City of Philadelphia*, 242 Pa. 47, 88 A. 904; *Sholl v. German Coal Co.*, 118 Ill. 427, 10 N. E. 199; *Fountain Park Co. v. Hensler*, 199 Ind. 95, 155 N. E. 465, 50 A. L. R. 1518.

The criticism was made in Nevada that our construction of the words "public use" would enable the State to condemn property for business enterprises such as hotels and theatres. *Dayton Mining Co. v. Seawell*, 11 Nev. 394, 411; 10 R. C. L., *Eminent Domain*, Sec. 23; 1 *Nichols, Eminent Domain*, 2d Ed., Sec. 40. "But why," demands one of the leading authorities on the subject in defense of the Maryland rule, "may not the Legislature provide for acquiring by condemnation a site for

a hotel or theatre to which the public shall have the right to resort and which shall be subject to public regulation in its management and charges? Is not this a mere question of expediency and public policy? And is not our opinion upon this question the outgrowth of the state of society in which we live and the usages and practices to which we are accustomed? In ancient times vast sums of money were expended in the construction and maintenance of public theatres, which were regarded as among the most important of public institutions. * * * Some discretion must be left to the Legislature. It is not to be presumed that they are wholly destitute of integrity or judgment. The people have left it for them to determine for what public uses private property may be condemned. If they abuse their trust, the responsibility is not upon the courts, nor the remedy in them." 1 *Lewis, Eminent Domain,* 3d Ed., Sec. 258. In sustaining the Maryland Housing Authorities Law, the Court of Appeals, speaking through Chief Judge Bond, said that if the statute had provided for housing accommodations for persons other than those of low income, its constitutionality would have been questionable. *Matthaei v. Housing Authority of Baltimore City,* 177 Md. 506, 514, 9 A. 2d 835. Nevertheless, it is now well known that the modern American city functions in the public interest as the proprietor and operator of many activities which were formerly carried on, and which in some instances are still carried on, by private enterprise. *New York City Housing Authority v. Muller,* 270 N. Y. 333, 1 N. E. 2d 153, 105 A. L. R. 905, 910. Furthermore, definite assurance has been given by the Supreme Court of the United States that, in deciding whether or not a particular use is public with appropriate regard to the diversity of local conditions, it considers with great respect legislative declarations and particularly the judgments of State courts as to the uses considered to be public in the light of local exigencies. *City of Cincinnati v. Vester,* 281 U. S. 439, 50 S. Ct. 360, 362, 74 L. Ed. 950.

But we need to deal now only with the specific question presented by the record at the present time. Here we are not faced with any difficulty, because it is universally conceded that a common carrier of passengers or freight is a public necessity. By express provision of the Maryland Railroad Law, every railroad company incorporated under the laws of this State is empowered to acquire land either by purchase or condemnation for as many sets of tracks as are deemed necessary from time to time between its termini within the State. Acts of 1918, Chap. 307; Code, 1939, Art. 23, Sec. 210. It is beyond question that land may be condemned when necessary for branch lines intended to carry passengers or freight from a main railroad line into less thickly settled regions. If the branch line forms an integral part of the railroad system, and is open to the public in the same manner as the main line, the number of people who will actually use it is immaterial. *Wilton v. County of St. Johns,* 98 Fla. 26, 123 So. 527, 65 A. L. R. 488; *Kettle River R. Co. v. Eastern Ry. Co.,* 41 Minn. 461, 43 N. W. 469. Undeniably no railroad company has the right to condemn land for a spur track intended for the exclusive use of a single private establishment. *Arnsperger v. Crawford,* 101 Md. 247, 256, 61 A. 413. Where, however, a branch line, although actually intended for a single mine, factory or other establishment, will be an integral part of the railroad system, and the public will have the right to use it under the provisions of the charter of the railroad corporation and the laws of the State, it will be considered for public use, even though the owners of the establishment may contribute toward the cost of construction. *New York Mining Co. v. Midland Mining Co.,* 99 Md. 506, 514, 58 A. 217; *Chicago Dock Co. v. Garrity,* 115 Ill. 155, 3 N. E. 448, 453; *Chicago & Northwestern Ry. Co. v. Moorehouse,* 112 Wis. 1, 87 N. W. 849, 56 L. R. A. 240, 88 Am. St. Rep. 918; *Union Lime Co. v Chicago & Northwestern Ry. Co.,* 233 U. S. 211, 34 S. Ct. 522, 58 L. Ed. 924. It may be argued that horse racing is but a pastime which does not in-

crease the natural resources or the industrial power of the community and does not promote the public welfare. Yet horse racing has been one of the most popular sports in Maryland since Colonial days and has long been fostered by this State. Since the branch line to Bowie Race Track will presumably be open to the general public, we hold that it is for public use, and that condemnation of land for that purpose does not violate the Declaration of Rights and the Constitution of Maryland or the Fourteenth Amendment of the Federal Constitution.

While the question whether or not the purpose of a taking is a public one is judicial, the necessity or expedience of the taking is a legislative question. *Sears v. City of Akron*, 246 U. S. 242, 38 S. Ct. 245, 248, 62 L. Ed. 688. The right to decide whether the power of eminent domain should be exercised for any particular public purpose, and whether the exigencies of the occasion and the public welfare warrant its exercise, are questions which rest entirely with the Legislature. *Clendaniel v. Conrad*, 3 Boyce, Del., 549, 83 A. 1036, 1048, Ann. Cas. 1915B, 968. Similarly, a corporation, to which this power has been delegated, has authority to determine when and to what extent it will be exercised, provided that the power is not abused. 1 *Lewis, Eminent Domain*, 3d Ed., Sec. 370. Where the charter of a railroad corporation, for example, designates the termini of the railroad but does not define the exact route to be taken between the termini, the question of the necessity, the propriety, or the expediency of resorting to the exercise of eminent domain to acquire certain properties for its tracks is left largely to the discretion of the directors of the corporation. No corporation, however, under color of eminent domain, has the right to take private property arbitrarily or utterly at variance with its delegated power and in such a way as to inflict unnecessary damage upon the property owner. In *New Central Coal Co. v. George's Creek Coal & Iron Co.*, 37 Md. 537, 564, Judge Alvey emphasized: "To justify the exercise of this extreme power, * * * the

party claiming the right of the exercise of the power should be required to show at least a reasonable degree of necessity for its exercise. Any rule less strict than this, with the large and almost indiscriminate delegation of the right to corporations, would likely lead to oppression, and the sacrifice of private right to corporate power." In the case before us it was alleged by the railroad company that it was necessary to construct and improve the line to Bowie in order to better secure the safety of persons and property, to increase its facilities and capacity for the transportation of its traffic, and to eliminate delays and hindrance to traffic. However, it would have been unnecessary and improper in this suit for injunction to adduce proof in support of these allegations. Allegations of abuse of statutory power usually raise problems of mathematics and engineering and other intricate questions of fact which equity courts should not be expected to consider, and such cases should always be submitted to the court of law specially vested with jurisdiction on the subject. In other words, there is no necessity for the intervention of a court of equity where the question is merely the extent to which the power of condemnation can be exercised with propriety, and the complainant has an adequate remedy at law. *Webster v. Susquehanna Pole Line Co.* 112, Md. 416, 424, 76 A. 254.

It is an accepted doctrine that the power of eminent domain is inalienable, and any agency clothed by the State with this sovereign power should hold it as a public trust to be exercised whenever public necessity and convenience require it. It is accordingly held that any contract which attempts to impair the power of eminent domain is void as being contrary to public policy. *Mobile & Ohio R. Co. v. Union City*, 137 Tenn. 491, 194 S. W. 572; 18 *Am. Jur., Eminent Domain*, Sec. 25. It appears from the record in this case that the Philadelphia, Baltimore & Washington Railroad Company, incorporated under the laws of Maryland, Pennsylvania and Delaware, leased its railroad lines and property to

the Pennsylvania Railroad Company, a Pennsylvania corporation, for the term of 999 years, beginning January 1, 1918. But the lessor expressly reserved its franchise and any other right or privilege which may be necessary to preserve its corporate existence or organization, and receives from the lessee an annual rent sufficient to pay not only interest on bonds and dividends on stock, but also organization, administration and legal expenses. Thus it maintains its corporate identity and is continuing to fulfill its obligations to the State. It is evident that the lessor may find it necessary at any time to resort to the power of eminent domain in order to enlarge or improve the railroad system or to meet exigencies growing out of increased transportation. Under some circumstances it is conceivable that a loss of such power might be destructive of important rights in the operation of the road, and might render the lease almost valueless. In such an event the lessor would be unable to perform its duty to the State. We, therefore, conclude that, except in the case of fraud, a domestic railroad corporation does not divest itself of the power to condemn private property necessary for corporate purposes by leasing its lines and property to another company, although the lessee itself may not have the right as a foreign corporation to exercise the power of eminent domain within this State. *New York, L. & W. R. Co. v. Union Steam-Boat Co.*, 99 N. Y. 12, 1 N. E. 27; *Snyder v. Baltimore & Ohio R. Co.*, 210 Pa. 500, 60 A. 151, 153; *Patterson Orchard Co. v. Southwest Arkansas Utilities Corporation*, 179 Ark. 1029, 18 S. W. 2d 1028, 65 A. L. R. 1446, 1453; *State ex rel. Trimble v. Superior Court of King County*, 31 Wash. 445, 72 P. 89.

Since the court of equity had no jurisdiction in this case, the decree of the chancellor sustaining the demurrer and dismissing the bill of complaint will be affirmed.

*Decree affirmed, with costs.*