## Elliott Nursery Co., Appellant, *v.* Duquesne Light Co.

*Equity—Nuisance—Injunction—Deposit of ashes, cinder and smoke—Light and power company—Public service company—Industrial district—Burning of bituminous coal—Remedy at law.*

1. In determining whether an injunction shall issue against the operation of a manufacturing plant, the chancellor will consider whether he will not do a greater injury by enjoining than would result from refusing, and leaving the party complaining to his redress at the hands of a court and jury.

2. A court exercising the power of a chancellor, when called to issue an injunction against a plant operated as an alleged nuisance, must look at the peculiar circumstances of the place wherein it is called upon to exercise its power.

3. A court of equity will not enjoin an electric light and power company, supplying light and power to the great bulk of the inhabitants, municipalities and industries of a great industrial district, from depositing ashes, cinders, smoke and sulphur dioxide, the product of the consumption of bituminous coal, on an adjoining property operated as a nursery, where it appears that bituminous coal was extensively used through the whole district, that the injury which would result from such action would be incalculably greater than that which would happen from refusing it, and that there were no appliances procurable by the company which would minimize the damage to the party complaining. Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, distinguished.

4. In such case it is immaterial that the defendant company is a public service company with the right of eminent domain.

Argued May 21, 1924. Appeal, No. 81, Oct. T., 1924, by plaintiff, from decree of C. P. Allegheny Co., July T., 1923, No. 23, refusing injunction in case of Elliott Nurs-

ery Co. v. Duquesne Light Co. Before FRAZER, WALL-ING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Bill for injunction. Before EVANS, J.
The opinion of the Supreme Court states the facts.
Injunction refused. Plaintiff appealed.

*Error assigned* was, inter alia, decree, quoting it.

*William G. Bechman,* with him *Allen H. Kerr,* for appellant.—It is not the ordinary deposit of smoke and dust from the stacks of defendant's plant such as ordinarily result from the combustion of coal in industrial districts of which plaintiff complains and seeks relief in equity; but it is the immense discharge of cinders, ashes, soot, smoke and sulphur dioxide gases, in extraordinary quantities, which defendant discharges from its stacks continuously on to plaintiff's property, of which plaintiff complains and seeks relief in this case: Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540; Stokes v. R. R., 214 Pa. 415; Robb v. Carnegie Bros. & Co., 145 Pa. 324.

The public utility character of defendant's business gives it no superior rights to infringe on the private rights of the plaintiff: Evans v. Fertilizing Co., 160 Pa. 209; Howell v. M'Coy, 3 Rawle 256.

Appellant is not required to show a negligent use and operation by defendant of its Colfax plant in this case, nor is it required to show what methods or appliances might be conveniently and economically used or installed to prevent the injury, before it is entitled to relief in equity: Evans v. Fertilizing Co., 160 Pa. 209; Pa. Lead Co.'s App., 96 Pa. 116; Vautier v. Refining Co., 231 Pa. 8; Mulchanock v. Cement Mfg. Co., 253 Pa. 262.

Plaintiff's injury being immediate, continuous, serious, considerable and irreparable, and being without an adequate remedy at law, it is entitled to relief by an in-

junction: Sullivan v. Steel Co., 208 Pa. 540; Lehigh Val. R. R. v. Graham, 64 Pa. Superior Ct. 437; Penna. Lead Co.'s App., 96 Pa. 116; Walters v. McElroy, 151 Pa. 549; Krocker v. Planing Mill Co., 274 Pa. 143; Woelpper v. Penn W. & P. Co., 250 Pa. 559; Rogers v. Traction Co., 182 Pa. 473.

No man's property can be taken, injured or destroyed either directly or indirectly without compensation under the laws of this State: Rogers v. Traction Co., 182 Pa. 473; Ganster v. Electric Co., 214 Pa. 628.

It is not a question whether or not plaintiff's property lies within the Pittsburgh district, but what are the prevailing conditions and circumstances immediately existing and surrounding the property: Sullivan v. Steel Co., 208 Pa. 540; Penna. Lead Co.'s App., 96 Pa. 116; Prendergast v. Walls, 257 Pa. 547; Krocker v. Planing Mill Co., 274 Pa. 143; Kramer v. Slattery, 260 Pa. 234.

*John J. Heard* and *Edwin W. Smith,* of *Reed, Smith, Shaw & McClay,* for appellee.—The granting of an injunction is not a matter of right: Richard's App., 57 Pa. 105; Dilworth's App., 91 Pa. 247; Heilman v. Street Ry., 175 Pa. 188; Berkey v. Coal Mining Co., 220 Pa. 65.

We know of only one case involving the question of a nuisance in which this court has found that the refusal of the lower court to grant an injunction was error. This is the case of Sullivan v. Steel Co., 208 Pa. 540. It is not in point here.

The court was right in refusing an injunction: Huckenstine's App., 70 Pa. 102; Myers v. R. R., 245 Pa. 534; Robb v. Carnegie Bros., 145 Pa. 324; Penna. R. R. v. Lippincott, 116 Pa. 472; Penna. R. R. v. Marchant, 119 Pa. 541; Hauck v. Pipe Line Co., 153 Pa. 366; Abraham v. Yardum, 64 Pa. Superior Ct. 225.

OPINION BY MR. JUSTICE SCHAFFER, July 8, 1924:

Plaintiff operates an extensive nursery in Springdale, Allegheny County, adjacent to which the electric power

plant of defendant is located. The nursery had been in existence for over twenty years before defendant's works in question were established. Plaintiff avers that, following the beginning of their operation in the year 1921, excessive quantities of ashes, cinders, smoke, soot, and sulphur dioxide, the products of combustion of bituminous coal, which defendant burned to the extent of 1,500 tons per day, were deposited on its nursery and the vegetation produced and growing therein, to its great injury. Declaring that the manner of operating the power plant created a nuisance, this bill was filed to restrain defendant from discharging and depositing the injurious substances on complainant's property. The learned chancellor who determined the case refused the relief prayed for, but, since complaint was also made as to damage done by coal dust coming from the handling of coal at defendant's coal storage yard, retained the bill, for the purpose of affording plaintiff relief in the event that it should appear later that the injury from coal dust had not ended. This latter phase of the controversy drops out of consideration, as plaintiff's appeal is from the refusal of relief from the substances emanating from the stacks.

Defendant's plant is on the Allegheny River sixteen miles from the business section of the City of Pittsburgh. It is but a short distance from the city limits, however, and was found by the court to be within the Pittsburgh industrial district. At the time of its completion in the fall of 1920, defendant's plant was the largest of its kind in the world and is now surpassed in size by but one other. It supplies power and light to the great bulk of the inhabitants, municipalities and industries, and substantially all of the street and interurban railways in Allegheny and Beaver counties, and to almost all the public buildings, hotels, churches, hospitals and schools in Allegheny County and to many in Beaver County. The electric energy generated is essential to the domestic and industrial life of a great community.

Appellant's request for an injunction restraining defendant from discharging cinders, dust, smoke and sulphur dioxide, was in effect a demand to close down the plant, as it is physically impossible to operate a plant in which bituminous coal is consumed without depositing some of the product of combustion upon neighboring property, there being no testimony on which dependence can be placed that there is any method of eliminating the deposits. The record discloses, even by the testimony of appellant's leading expert witness, that the plant, as it is built and operated, prevents a greater proportion of cinders and solid matter from escaping through its stacks than any other plant in the country. While it was indicated by this witness that there are devices used for preventing such discharges, he admitted that the fine particles could not be eliminated except at prohibitive cost. His testimony did not impress the chancellor and he refused to find that the cinder-arrester installed by defendant is not the best and most efficient device that could be provided and also declined to find that defendant could install screens, filters and baffle plates or use other appliances and methods to eliminate a large proportion of the discharges, or that the deposits are greater than prevail in the heart of a large industrial settlement or city. He affirmatively found that appellee's plant is operated in accordance with the best practice prevailing in power-house operation, and that no negligence was shown or indicated in connection therewith, that the stokers in use are the most fully and highly developed known, and that by their use coal is consumed with the production of the least amount of cinders, smoke, soot and ash possible in the consumption of the quantities of coal burned by defendant, that each stack and its connections are equipped with cinder arresters of the most modern and approved type, and that before they were selected all other types or devices for arresting cinders were thoroughly investigated by experienced engineers, who were unable to find

any as efficient as the ones installed. He also found that nothing is discharged into the air except the ordinary products arising from the combustion of bituminous coal. Another finding was that it is often quite smoky in the general neighborhood of plaintiff's nursery, by reason of the smoke which comes from locomotives and industries along the Allegheny River and the Pittsburgh district generally, that this condition existed prior to operation by defendant, that all of the plants in the district burn soft coal and emit smoke and other products of combustion, and that the amount of bituminous coal consumed yearly in Pittsburgh is 5,000,000 tons and in the Pittsburgh district 20,000,000 tons. The evidence submitted convinced him that "Black smoke seldom, if ever, is emitted from the stacks of defendant's plant. The ordinary discharge from the stacks appears as a light gray or yellowish vapor, which seems to flow out instead of being forced or shot out at high velocities, as occurs when locomotives are in operation." He determined that there is no means known to engineers by which the amount of cinders, soot and sulphur dioxide deposited on the plaintiff's property from defendant's stacks could be diminished. Speaking of general conditions, he said: "The deposit of cinders, soot and ash resulting from the burning of bituminous coal, sufficient to interfere seriously with the growth of vegetation is a common condition in what is known as the Pittsburgh district," and that while "There are places within [its] limits where flowers, plants and shrubbery may be successfully grown,......by the gradual extension of manufacturing establishments consuming large quantities of bituminous coal, the places where such a nursery as plaintiff's can be successfully conducted are gradually growing fewer." The chancellor further found that "The deposit of cinders, soot, ash and SO2 [sulphur dioxide] on the plaintiff's property, is not such a trespass, the continuance of which would amount to a nuisance and entitle the plaintiff to equitable remedy by

injunction." Speaking of the general industrial conditions, he said: "The City of Pittsburgh and the territory surrounding it generally known as the Pittsburgh district is sustained almost entirely by industries, the power to operate which is taken from the combustion of bituminous coal. To draw a circle around the city and say that no industry may operate beyond that line, when injury may result to adjoining properties, is to fix an absolute limit to the growth of the community." He decided that the testimony of plaintiff's expert engineer, as to devices which could be installed to lessen the deposits from the stacks, showed his ideas to be experimental, the results to be obtained uncertain and the costs and length of time required to install them unknown. He adjudged it to be unwise and improper to close down the plant of such a public service corporation as defendant, essential as it is to the great industrial community which it serves, on such a showing as plaintiff was able to make, particularly in the light of testimony of the engineers called by defendant who had built the plant, and who said they had examined all the known appliances and all the most up-to-date constructions and had built it in accordance therewith. Speaking of this testimony, the chancellor said: "In support of the finding of fact that the Colfax [defendant's] plant is constructed on the most approved engineering [methods] and that there is no practical means known by which the amount of cinders, soot, ash and SO2 could be lessened, the defendant produced what to us is conclusive evidence in the testimony of Messrs. Graves, Clark and Krisinger. Mr. Clark designed and built the Colfax plant and has built practically all of the large plants of this kind in the country, has observed the workings of the other large plants, including the plant built since the Colfax plant. A reading of the testimony of these three witnesses we are certain would satisfy any chancellor that the Colfax plant is built on the most approved plans." Our perusal of the testimony of these

witnesses convinces us that this conclusion is fully warranted.

We deem it unnecessary to elaborately discuss text-book authorities and adjudicated cases dealing with the subject of restrainable nuisances. There is a wealth of authority on the subject. The governing principles and the cases which announced them are to be found in Pomeroy's Equity Jurisprudence, 2d ed., 1919, vol. 5, chapter 24; Story's Equity Jurisprudence, 14th ed., 1918, vol. 2, sec. 1248 et seq. Here, we are dealing with a situation and district unique in the world. The designation of Pittsburgh is "the Smoky City." Those living and carrying on their affairs therein and in the district which it centers have been required for generations to put up with the disadvantages which result from its great industrial activities in order that they may be carried on. They have expanded and are bound to further expand as the country's business grows. To say that the results necessarily flowing from the use of bituminous coal, which may be injurious to particular businesses and to certain kinds of property shall be enjoined, means, under present-day engineering knowledge, that plants such as that of defendant, vital to the community's industrial life and supremacy, must be hampered in their operation or indeed closed down. It would take a stronger showing than that made on the record before us to warrant such drastic and far-reaching action, when there is at plaintiff's hand a remedy at law to redress the injuries it may have suffered: 6 American Law Reports 1581; Pomeroy's Equity Jurisprudence, vol. 5, section 1927.

It is still the equitable rule that "The chancellor will consider whether he would not do a greater injury by enjoining than would result from refusing, and leaving the party to his redress at the hands of a court and jury": Richards's App., 57 Pa. 105, 113. There are "Many things a chancellor must consider when called on to strike down a lawful business, necessary to be car-

ried on for the public weal. It often becomes a grave question whether so great an injury would not be done to the community by enjoining the business, that a complaining party should be left to his remedy at law": Dilworth's App., 91 Pa. 247, 250; Heilman v. Lebanon & Annville St. Ry. Co., 175 Pa. 188, 199.

In Richards's App., 57 Pa. 105, a bill was filed against the Phœnix Iron Works by the plaintiff, who had a factory near by. The complaint was against the clouds of black soot and smoke which at times pervaded all parts of plaintiff's house and factory and which it was alleged unless discontinued would compel him to move from his house. There was also great damage done to the cloth he manufactured. What was there said has pertinence to the case in hand and indicates the attitude which our courts have always maintained since they possessed chancery powers in cases of this kind, that there must be a balancing of injuries to determine whether an injunction shall or shall not issue. We said (p. 111): "A careful consideration of the testimony satisfies us that the use of semi-bituminous coal, the fuel complained of, is necessary to the successful manufacture of iron fit for [certain uses], in the manufacture of which the defendants are largely engaged; the process of manufacture, and fuel used, are generally employed in similar establishments,......Whatever of injury may have, or shall result, to his property from the defendants' works, by reason of the nuisance complained of, is such only as is incident to a lawful business conducted in the ordinary way, and by no unusual means. Still there may be injury to the plaintiff; but this of itself may not entitle him to the remedy he seeks. It may not, if ever so clearly established, be a case in which equity ought to enjoin the defendants in the use of a material necessary to the successful production of an article of such prime necessity as good iron [in the instant case of electricity for public use], especially if it be certain that a greater injury would ensue by enjoining than would result from a re-

fusal to enjoin." The same line of thought was pursued and the same policy announced in Huckenstine's App., 70 Pa. 102, where the injunction sought was against a brick works on the outskirts of the City of Allegheny, now a part of Pittsburgh. There, the testimony disclosed that the winds brought great quantities of smoke, gas and other products of combustion of soft coal from the brickyard of defendant upon plaintiff's land, that this had already seriously damaged plaintiff's vineyard and residence, and if continued, would destroy them and greatly depreciate his property. The lower court issued an injunction restraining the defendant from making bricks in such manner as to affect injuriously the plaintiff's premises and from allowing smoke and gas from the kilns to be blown on to his land so as to injure the vegetation and buildings thereon. The decree was reversed in an opinion by Mr. Justice AGNEW, in which it was said (p. 106) : "A court exercising the power of a chancellor, whose arm may fall with crushing force upon the every-day business of man, destroying lawful means of support, and diverting property from legitimate uses, cannot approach such cases as this with too much caution. Its aid is not of right but of grace, and it must be sure that the exercise of this kingly power is just, wise and proper, before it takes from a citizen his means of livelihood, and destroys the value of his property for legitimate uses. And more than this, it must look at the customs of the people......*and the peculiar circumstances of the place wherein it is called upon to exercise the power*......The properties of the plaintiff and defendant lie adjoining each other, on the hillside overlooking the city, whose every-day cloud of smoke from thousands of chimneys and stacks hangs like a pall over it, obscuring it from sight. This single word describes the characteristics of this city, its kind of fuel, its business, the habits of its people, and the industries which give it prosperity and wealth. The people who live in such a city *or within its sphere of influence* do so of choice, and

they voluntarily subject themselves to its peculiarities and its discomforts, for the greater benefit they think they derive from their residence or their business there. A chancellor cannot disregard all this."

Robb v. Carnegie Bros. & Co., 145 Pa. 342, was an action in trespass for damages done to the plaintiff's land arising from the operation of coke ovens by defendant, and we said (p. 339) : "To enjoin the manufacture of coke, at such a site, would amount to a prohibition of its manufacture, and the destruction of vast allied and dependent industries of immense value to the public as well as to those directly engaged in them." There would be a worse outcome if the operation of appellee's plant was to be enjoined.

Much attention has been paid in the printed briefs of counsel on both sides to defendant's rights, obligations, duties and responsibilities as a public service corporation; on the plaintiff's behalf it being contended that, having the right of eminent domain, defendant must condemn the nursery if its operation is inevitably to injure it, and, on behalf of the defendant, that, under cases like Penna. R. R. Co. v. Lippincott, 116 Pa. 472, and Penna. R. R. Co. v. Marchant, 119 Pa. 541, and other cases cited, the operation of its plant being non-negligent, it is not responsible to plaintiff. We do not deem it important to discuss the questions which might grow out of the circumstance that defendant is a public service corporation and possesses certain powers of eminent domain,—whether it could condemn plaintiff's nursery, simply because its operation may injure it, unless it is shown that the property is essential for public use, may in these days of the regulation of public utility companies be open to question. We plant our conclusion on the broader general ground, taken by the court below, that it would not be the part of wisdom, under the facts shown by the record before us, to enjoin the depositing of the substances which are the results of combustion of bituminous coal in the Pittsburgh district, that the in-

jury which would result from such action, as applied to defendant, furnishing power and light to the manifold interests it does, would be incalculably greater than that which will happen from refusing it, and leaving plaintiff to its legal remedy, it not being shown by such testimony as should appeal to a court of equity that there are appliances procurable by defendant, the installation of which would minimize plaintiff's damage.

On the oral argument, there was enlightening discussion by counsel on both sides of the case of Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, and it has been elaborately analyzed in the printed briefs, plaintiff contending that the issuing of an injunction in that case would warrant one here, and defendant that the special circumstances there shown do not here apply. We think that controversy was adjudged wisely and with foresight. The court was careful to point out that its doctrine would not be applied to such a case as the one with which we are now dealing. What was complained of had to do, not with damage to the plaintiff's property from the burning of coal, but with damage occasioned by the depositing of large quantities of finely powdered iron ore due to "slips" in the defendant's furnaces. It was said (p. 546) : "The appellants are not complaining because appellee is operating its furnaces. They would not be heard if that were their only complaint. The City of Pittsburgh is a busy manufacturing center, and by day and by night clouds of smoke ascend from the stacks of its numberless mills, factories and furnaces, ofttimes hanging over it like a pall......They [plaintiffs] must expect a measure of annoyance and discomfort, arising from the dust and smoke, which cannot be avoided in their manufacturing metropolis, and are borne to the homes of the city and fill the air that is breathed...... Their complaint is that the appellee, in tearing down the three furnaces and replacing them with the four new ones, of immense size and several times the capacity of the old, and in using in them the fine 'Mesaba' ore dust,

without so operating them as to prevent the escape of the dust from 'slips,' causing admitted devastation, is practically confiscating their properties......[p. 548.] If this bill were for relief from personal inconvenience and interference with the appellants' full and free enjoyment of their property, *due merely to the conditions of smoke and dust......it would be promptly dismissed."*

After consideration of the evidence submitted on both sides, our conclusion is that the decree entered by the court below was proper; all the assignments of error are, therefore, overruled.

The decree is affirmed, costs on this appeal to be paid by appellant.