CELSO FIGUEROA VELÁZQUEZ, for himself and as representative of the conjugal partnership composed with his wife Carmen Pagán Figueroa, Plaintiffs and Appellees, v. AQUEDUCT AND SEWER AUTHORITY, Defendant and Appellant.

No. R-66-338.          Decided May 26, 1970.

*José O. Sabater, Ernesto C. Blanco, Aida Martínez González,* and *Jorge López Ramírez* for appellant. *Héctor Lugo Bougal, Delia María Auffant,* and *Delia Lugo Bougal* for appellees.

PER CURIAM: In a petition for injunction filed by the conjugal partnership constituted by the spouses Celso Figueroa Velázquez and Carmen Pagán Figueroa, against the Aqueduct and Sewer Authority,[1] the Ponce Part of the Superior Court rendered judgment (1) granting the petition for injunction and ordering defendant to remove the sewer pump situated next to plaintiffs' house, placing said pump in a place where it would not be in conflict with the welfare, comfort, and enjoyment of property to which every person is entitled, and (2) sustaining the complaint for damages and ordering defendant to pay to plaintiffs the sum of $200 for moral sufferings.

The foregoing judgment is grounded on the following:

### "Findings of Fact:

"1. Plaintiffs are owners, in fee simple, of a property in Villa Flores Housing Development, Ponce, Puerto Rico, where they live with their six children.

"2. Next to plaintiffs' house, on the west boundary, there is the lot where a shack, which has in its interior a pump of the sewer system that receives all the sewer waters of the Villa Flores Housing Development, is erected.

"3. These findings of fact perceived by the trial court during the ocular inspections, as they appeared recited in detail in the minutes of the same, dated September 13, 1966, and in the statement of facts which appears at the beginning of this opinion,

---

[1] Said conjugal partnership filed also an action for damages against the Authority, both cases having been consolidated in the trial court.

which will be considered as the findings of the court, are adopted and made part of the same.

"4. This court has no doubt as to the fact that this sewer pump is a public convenience necessary in Villa Flores Housing Development, and that its management and control is being determined with good faith on the part of those who are in charge of the same. However, this court concludes that said pump is not situated in an adequate place and that the pestilence which emanates from the same transcends the limit of what is reasonable, and that as a result therefrom it is destroying or prejudicing plaintiffs' right to the comfortable use and enjoyment of life and their property, prejudicing plaintiffs' and their minor children's health, affecting the value of their property and causing plaintiffs moral sufferings for that reason." (Pp. 132, 133.)

Making reference to the two ocular inspections made and after describing plaintiffs' house, as well as the pump shack, the trial court stated:

"The undersigned judge entered, with all the aforementioned persons, defendant's lot and inside the shack built therein. The same has only one story with a basement to which you go down by an iron stair contiguous to the wall.

"In the shack's only story the court observed that there were installed two rotary air compressors whose function is to compress the air which is stored in a tank which is outside of the shack on the north side of the same. The compression system works on compressed air.

"In said premises of the shack there are two receptacles or pots. The sewer water which comes from outside, from all the housing development, enters through a sealed pipe into the two pots or receptacles mentioned, which are hermetically sealed because they work on compressed air; said pots or receptacles have two electrodes from the upper part downwards. One of said electrodes is 6 inches long and the other is about 10 or 12 inches long.

"On the shack's lot and facing the same there is a tank called 'sewer manhole' with a diameter of about five (5) feet, where all the sewer waters from the housing development are received and from there they go to said receptacles or pots by

gravity, through a direct pipe which connects the 'manhole' with the 'pots.' Said 'manhole' is made of reinforced cement with an approximate depth of 25 feet and has a cast iron cover of 22 inches diameter. On that cover there is a hole which allows the escape of gases which are created inside the 'manhole.' To this hole, which is very important for the decision of this case, we shall refer further on.

"All the sewage from the entire housing development is carried into this 'manhole' from another 'manhole' which is installed on the sidewalk facing State Highway No. 1, more or less like the one which we have described and which is inside the shack's lot.

"Along said sidewalk, from west to east, the judge walked with all the persons present, passing in front of about eight residential houses of said housing development, occupied by other persons, and at intervals he could observe other cement 'manholes' identical with the one which we have aforedescribed.

"The sewage flows through a pipe along these 'manholes' from east to west, until it reaches the one on the sidewalk facing the shack's lot, from here it all goes to the interior 'manhole' in the yard where the shack is located and in front thereof where all the sewage from the housing development is accumulated, and from here, as we have explained before, by gravity and through a pipe it goes directly to the 'pots' located in the lot.

"The mechanism of the entire installation is the following: The said sewage level rises to within one of the 'pots' and when it touches the shortest electrode it activates one of the valves and allows the compressed air which is stored inside the pot which is located outside of the north part of the shack to enter. This compressed air displaces the sewage contained in the 'pot,' lowering the level thereof within the 'pot' and displacing it through a cast iron pipe which carries it to the sewer system of the town and from there to the Caribbean Sea.

"Returning to the hole that exists under the aforementioned 'manholes,' which, as we have said, allows the gases which are created inside the manhole to go outside in the open air, the court could perceive that through the hole in the cover of the 'manhole' which is inside the shack, I mean, inside the lot of the shack where all the sewage of the housing development is accumulated, there is a strong smell of excrement, which as soon as

the judge had alighted from the automobile which drove him to the place, disagreeably hurt his sense of smell. The judge stopped at the house carport and there said foul odor was strongly noticed.

"It is true that Mr. Blanco, one of the attorneys for defendant, to questions of this judge, stated that he did not notice any disagreeable odor when the 'manhole' which exists in front of the lot where defendant's shack is erected was being examined, and at the carport, but this judge did notice it, as a question of fact, and not because his sense of smell was more pronounced than that of Mr. Blanco.

"It is also true that Mr. Blanco answered that same question likewise, when we were walking in front of the fourth and eighth house after defendant's shack, and the court wants to state that at that distance and in front of the fourth house, the foul odor was noticed, although not so strongly, but in front of the eighth house it was not noticed.

"Plaintiffs explained to the judge that the cover of the 'manhole' which is inside the shack's lot and in front thereof, sometimes was raised to a certain height from its place, and engineer Javier Ríos Matos explained in that act and in the hearing of October 4, 1965, satisfactorily for the court, the reason why that happened. But regardless of this and of the purpose of the pipe which is over the shack's roof, the court noticed the foul odor.

"As to the noise, when the compressed air activates the compressors, during the time that the judge was there, one of them worked, around 8:00 o'clock at night, whose functioning lasted less than one minute, and said noise is not strong, except the one produced by a gas motor which, when the electric current is cut off, begins to function automatically to activate one of the compressors, and which is strong enough, but lasts less than one minute, and that only occurs when the electric current is cut off, which hardly ever happens.

"In the second ocular inspection which was performed on October 4, 1965, during the morning, plaintiffs and their counsel, the defendant and its counsel, and their representatives being present, the judge entered with them into the interior of the house and at that moment the odor was not noticed. The court wants to state that it made a test with a handkerchief on the wind to determine the direction of the wind at that moment, and

the handkerchief moved in an opposite direction from plaintiffs' house." (Opinion and Judgment, pp. 2 to 5.)

Among other conclusions of law, the trial court made the following:

"3. In the case at bar, this court concludes, as a question of law, that the sewer pump involved in the instant proceeding is not a nuisance per se, but because of its proximity to plaintiffs' residence and to the foul odors which emanate from the same, it has become a 'nuisance on account of the way it is managed, controlled, and operated.' "

It is necessary to refer to other facts which arise from the record and which have been established by stipulation of the parties or by uncontroverted evidence.

Villa Flores Housing Development, where plaintiffs' house is located, was built by Cooperativa de Hogares Villa Flores and contains 294 houses for persons of middle income. The lands of the housing development being in a lower level than that of the sewer system of the City of Ponce, defendant-appellant in approving the aqueduct and sewer system of said housing development required the construction of a pneumatic ejectors' plant to collect, by that means, the discharge of sewage and to pump it by pressure to a manhole of a main near the project and which discharges into the litoral of the Caribbean Sea. The pumping plant, as it was approved by the corresponding authorities (Planning Board, Department of Health, and defendant itself), was located on the southwest corner of the housing development, bounded on the south by State Highway No. 1. The sewage flow to that place by gravity, it being therefore, one of the lowest areas of the housing development.

After all the housing development sewer was constructed, the pump system or pneumatic ejectors' plant was granted to defendant-appellant for its maintenance and operation. The equipment of the ejectors' plant acquired by the Cooperativa is of a modern construction and the best that science has been

able to produce lately. This system is used in innumerable housing developments in Puerto Rico. When plaintiff selected and acquired his house, the shack for the ejectors was already constructed. According to his testimony, he was assured that said installation would not cause him nuisances nor prejudices.

The evidence does not reveal that in the housing development's lands there is another available place to locate this pumping plant, so that the foul odors do not affect other house owners. Not even resorting to the condemnation of the house of any resident thereof. The cost of relocating the plant, which would entail changing the actual sewer system, breaking up the streets, excavating to place new pipes, etc., would not be less than $100,000.

The foregoing facts establish that the action taken by the trial court in granting the petition for injunction is extremely drastic. Defendant synthesizes its contention in the following manner:

". . . (1) the pumping plant involved in the proceeding was properly located according to the technical studies performed by government experts; (2) that it renders a public service to a community composed of 295 families, including plaintiffs-appellees; (3) that only said plaintiffs, one sole family, on account of having acquired its residence in the only two lots bounding said pumping plant and with prior knowledge of its existence, are the only ones affected; (4) that the nuisance is light, not persistent or constant; (5) that the injunction which orders the removal of said pumping plant is drastic for the incalculable damages which would be occasioned to defendant-appellant; (6) that in any other place where the pumping plant could be located the same situation would arise affecting other residents in the same housing development; (7) that there are other means to lessen and perhaps to stop completely the nuisances and inconveniences allegedly suffered now by plaintiffs-appellees, as would be to relocate the manholes outside of the area of the pump house, which could be done for an insignificant cost, as compared with the extraordinary cost of removing the

pumping plant from the place it is located." (Page 6, defendant's memorandum.)

Although the indirect trespass of plaintiffs' rights were not slight, even then the balance of rights and equities involved in the case should be considered before adopting the drastic determination made by the trial court.[2]

If there are other means to eliminate or considerably lessen the foul odors of which plaintiffs complain, such as the relocation of the manholes outside of the area of the pump house, as defendant indicates, the judgment for injunction should have been limited to order defendant to perform the reasonable and adequate works or reforms to eliminate or lessen the nuisance caused by the foul odors within a reasonable time. *Arcelay* v. *Sánchez*, 77 P.R.R. 782 (1955).

For the reasons stated, the judgment of the Superior Court, Ponce Part, should be reversed insofar as it orders defendant-appellant to remove the sewer pump located next to plaintiffs' house, remanding the case in order that said court may issue a new order in harmony with the terms of this decision.[3] As to the pronouncement ordering defendant to compensate the damages suffered by plaintiffs, said judgment will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein.

---

[2] See 66 C.J.S. § 118; Lewis & Spelling, The Law of Injunction 594, § 295; 40 A.L.R.2d 1187; *Fields Sewerage Co.* v. *Bishop*, 30 S.W.2d 412; *Valparaiso* v. *Hagen*, 54 N.E. 1062; *Elliott Nursery Co.* v. *Duquesne Light Co.*, 281 Pa. 166; 39 Am. Jur. 161.

[3] See *Casiano Sales* v. *Lozada Torres*, 91 P.R.R. 473 (1964).