CELSO FIGUEROA VELÁZQUEZ, por sí y en representación de la Sociedad Legal de Gananciales compuesta con su esposa Carmen Pagán de Figueroa, demandantes y recurridos, *v.* AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, demandada y recurrente.

*Número:* R-66-338          *Resuelto:* 26 de mayo de 1970

*José O. Sabater, Ernesto C. Blanco, Aida Martínez González* y *Jorge López Ramírez,* abogados de la recurrente; *Héctor Lugo Bougal, Delia María Auffant* y *Delia Lugo Bougal,* abogados de los recurridos.

PER CURIAM: En una solicitud de *injunction* presentada por la Sociedad de Gananciales constituida por los esposos Celso Figueroa Velázquez y Carmen Pagán de Figueroa, contra la Autoridad de Acueductos y Alcantarillados, (¹) la Sala de Ponce del Tribunal Superior, dictó sentencia 1) declarando con lugar la petición de *injunction* y ordenando a la demandada que remueva la bomba de alcantarillado localizada al lado de la casa de los demandantes, colocando dicha bomba en un lugar que no conflija con el bienestar, comodidad y disfrute de la propiedad a que tiene derecho toda persona, y 2) declarando con lugar la demanda de daños y perjuicios y condenando a la demandada a pagar a los demandantes la suma de $200.00 por sufrimientos morales.

La anterior sentencia está basada en las siguientes:
"Determinaciones de Hechos:

1. Los demandantes son dueños en pleno dominio de una propiedad en la Urbanización Villa Flores de Ponce, Puerto Rico, donde residen con sus seis hijos.

2. Al lado de la casa de los demandantes, en su colindancia Oeste se encuentra el solar donde está enclavada una caseta que posee en su interior una bomba del sistema de alcantarillados, la cual recoge todas las aguas de albañal o cloacales de la Urbanización Villa Flores.

---

(¹) Dicha Sociedad de Gananciales radicó además una demanda en reclamación de daños y perjuicios contra la Autoridad, habiéndose consolidado ambos casos en el tribunal de instancia.

3. Se adoptan y se incluyen como parte de estas determinaciones de hechos percibidos por el tribunal en las inspecciones oculares, según aparecen relatadas detalladamente en el Acta de las mismas de fecha 13 de septiembre de 1966, y en la Relación de Hechos que aparece al principio de esta opinión, las cuales se considerarán como determinaciones de hechos del Tribunal.

4. No tiene dudas este Tribunal en cuanto a que esta bomba de alcantarillados es una necesidad pública y necesaria para la Urbanización Villa Flores; y que su manejo y control está siendo determinado por una buena fe de los que la tienen a su cargo. No obstante, concluye este Tribunal que dicha bomba no está localizada en un lugar apropiado y que la pestilencia que emana de la misma trasciende el límite de lo razonable y que como consecuencia de ello está destruyendo o perjudicando el derecho que tienen los demandantes al cómodo goce y disfrute de la vida y de sus bienes, perjudicando la salud de los demandantes y de sus hijos menores de edad, afectando el valor de la propiedad y causando a los demandantes sufrimientos morales por tal motivo." (Págs. 132, 133.)

Refiriéndose a las dos inspecciones oculares celebradas y luego de describir tanto la casa de los demandantes como la caseta de bombas, el tribunal hace constar:

"El Juez que suscribe penetró con todas las personas antes indicadas en el solar de la demandada y dentro de la referida caseta allí construida. La misma es de una sola planta con un sótano al cual se baja por una escalera de hierro pegada a la pared.

En la única planta de la caseta el Tribunal observó instalados dos compresores (rotary air compressors) la función de los cuales es comprimir el aire que se almacena en un tanque que hay fuera de la caseta en el lado Norte de la misma. El sistema de los compresores trabaja a base de aire comprimido.

En el mencionado local de la caseta hay dos receptáculos o potes llamados en inglés 'pots'. Las aguas de albañal o cloacales que vienen de afuera de toda la urbanización entran por una tubería sellada a los dos potes o receptáculos mencionados, que están herméticamente sellados porque trabajan con aire comprimido, cuyos potes o receptáculos tienen dos electrodos que

parten de la parte superior hacia abajo. Uno de dichos electrodos tiene 6 pulgadas de largo y el otro alrededor de 10 a 12 pulgadas.

En el solar de la caseta y frente a ésta hay un depósito llamado 'registro de alcantarilla' como de cinco (5) pies de diámetro, en el cual se reciben todas las aguas de albañal o cloacales de la urbanización, y de ahí pasan a los mencionados receptáculos o potes (pots) por gravedad, a través de una tubería directa que conecta el 'registro' con los 'pots'. Dicho 'Registro' es de cemento armado con una profundidad aproximada de 25 pies y tiene una tapa de hierro colado de 22 pulgadas de diámetros. En esa tapa hay un agujero que permite la salida de los gases que se forman dentro del 'registro'. A este agujero, que es muy importante para la resolución de este caso, nos referiremos más adelante.

A este 'registro' vienen, de otro 'registro' que está instalado en la acera que da a la carretera estatal # 1 más o menos igual al que hemos descrito que está dentro del solar de la caseta, todas las aguas negras que provienen de toda la urbanización.

A lo largo de la referida acera, en dirección de Oeste a Este, el Juez caminó con todas las personas que estaban presentes, pasando frente a un número como de ocho casas residencias de dicha urbanización, ocupadas por otras personas y a intervalos pudo observar otros 'registros' de cemento idénticos al que hemos descrito antes.

Las aguas de albañal o cloacales corren por una tubería a través de estos 'registros' de este a oeste, hasta llegar al que está en la acera frente al solar de la caseta, de ésta pasan todas al 'registro' interior en el patio que está en la caseta y frente a ésta, donde se acumulan todas las aguas negras de albañal o cloacales de toda la urbanización, y de aquí, como hemos explicado antes, por gravedad y a través de una tubería van directamente a los 'pots' ubicados en el solar.

El mecanismo de toda la instalación es el siguiente: Las referidas aguas de albañal van subiendo en su nivel dentro de uno de los 'pots' y cuando tocan el electrodo más corto, accionan una de las válvulas y permiten que entre aire comprimido del que está almacenado dentro del 'pot' afuera y en la parte norte de la caseta. Este aire comprimido desplaza las aguas de albañal contenidas en el 'pot' bajando la elevación de las mismas dentro

del 'pot' y desplazándolas por un tubo de hierro fundido que las conduce al sistema de alcantarillado del pueblo y de ahí hasta el Mar Caribe.

Volviendo al agujero que existe debajo de los 'registros' mencionados, que, como hemos dicho, permiten que los gases que se forman dentro del registro salgan afuera, al aire libre, el Tribunal pudo percibir que por el agujero de la tapa del 'registro' que está dentro de la caseta, digo dentro del solar de la caseta en el cual vienen a acumularse todas las aguas de albañal y cloacales de la urbanización, sale un fuerte olor a excremento que apenas bajado el Juez del automóvil que lo condujo al sitio, hirió desagradablemente su sentido del olfato. El Juez se detuvo en la marquesina de la casa, y allí se percibe fuertemente dicho mal olor.

Es cierto que el Lic. Blanco, uno de los abogados de la demandada, a preguntas de este Juez, le manifestó que él no percibía olor desagradablemente alguno cuando se estaba examinando el 'registro' que existe frente al solar donde está ubicada la caseta de la demandada, y en la marquesina, pero este Juez sí lo percibió como cuestión de hecho, y no porque su sentido del olfato fuera más pronunciado que el del Lic. Blanco.

También es cierto que esa misma pregunta la contestó igualmente el Lic. Blanco, cuando caminábamos frente a la cuarta casa y la octava casa, después de la caseta de la demandada, y el Tribunal quiere hacer constar que a esa distancia, y frente a la cuarta casa, se percibía el mal olor, aunque no tan fuerte, **pero frente a la octava casa no se percibía.**

Los demandantes explicaron al Juez que la tapa del 'registro' que hay dentro del solar de la caseta y frente a ésta, había veces que se levantaba a cierta altura de su sitio y el ingeniero Javier Ríos Matos explicó, en ese acto y en la vista del 4 de octubre de 1965, satisfactoriamente para la corte, por qué eso ocurría. Pero independientemente de eso, y del propósito del tubo que existe sobre el techo de la caseta, el Tribunal percibía el mal olor.

El [*sic*] cuanto al ruido, cuando el aire comprimido pone a accionar los compresores, durante el tiempo que el Juez estuvo allí, funcionó uno de ellos, como a las 8 de la noche, cuyo funcionamiento duró menos de un minuto, y dicho ruido no es fuerte, excepto el que produce un motor de gasolina, que cuando

se va la corriente eléctrica empieza a funcionar automáticamente para mover uno de los compresores, y el cual es bastante fuerte, pero dura menos de un minuto, y sólo ocurre cuando se va la corriente eléctrica, lo cual no ocurre casi nunca.

En la segunda inspección ocular que se efectuó el 4 de octubre de 1965, en las horas de la mañana, estando presente la parte demandante y su abogado, la demandada y su abogado, y sus representantes, el Juez penetró con ellos en el interior de la casa, y en ese momento no se percibía el olor. El Tribunal quiere hacer constar que hizo una prueba con un pañuelo al aire para determinar la dirección del viento en esos momentos, y el pañuelo flotó en dirección contraria a la casa de los demandantes." (Opinión y Sentencia, págs. 2 a 5.)

Entre otras conclusiones de derecho, el tribunal sentenciador formuló la siguiente:

"3. En el caso que nos ocupa, este Tribunal concluye como cuestión de derecho que la bomba de alcantarillado envuelta en el presente recurso no es un nuisance per se, pero que por su proximidad a la residencia de los demandantes y a los malos olores que emanan de ella se ha convertido en un 'nuisance por su forma de manejarla, controlarla y operarla.' "

Es necesario hacer referencia a otros hechos que surgen del récord, establecidos o por estipulación de las partes o por prueba incontrovertida.

La Urbanización Villa Flores, donde ubica la casa de los demandantes, fue construida por la Cooperativa de Hogares Villa Flores y consta de 294 viviendas para personas de medianos recursos. Estando los terrenos de la urbanización más bajos del nivel en que se encuentra el sistema de alcantarillados de la ciudad de Ponce, la demandada recurrente, al aprobar el sistema de acueductos y alcantarillados de dicha urbanización, requirió la construcción de una planta de eyectores neumáticos para recoger, por ese medio, las descargas de aguas negras y bombearlas a presión hasta un registro de una troncal cercana al proyecto y que descarga en el litoral del mar Caribe. La estación de bomba, según fue aprobada

por las autoridades correspondientes (Junta de Planificación, Departamento de Salud y la propia demandada) quedó ubicada en la esquina suroeste de la urbanización, colindando por el Sur con la carretera Estatal Núm. 1. Las aguas de albañal discurren a ese sitio por gravedad, siendo por tanto, uno de los puntos de más bajo nivel en la Urbanización.

Luego de construido todo el sistema de alcantarillado de la Urbanización, fue cedido a la demandada-recurrente el sistema de bombas o planta de eyectores neumáticos para su conservación y operación. El equipo de la estación de eyectores adquirido por la Cooperativa es de moderna construcción y lo mejor que la ciencia ha podido producir recientemente. Este sistema se usa en innumerables urbanizaciones en Puerto Rico. Cuando el demandante seleccionó y adquirió su casa ya estaba construida la caseta para los eyectores. Según su testimonio, se le aseguró que dicha instalación no le causaría molestias ni perjuicios.

La prueba no revela que en los terrenos de la Urbanización haya otro sitio disponible para localizar la estación de bombas, de manera que los malos olores no afecten a otros dueños de casas. Ni aun si se recurriera a la expropiación de la casa de alguno de los allí residentes. El costo de relocalizar la estación, que conllevaría cambiar el actual sistema de alcantarillado, rompiendo las calles, haciendo excavaciones para la colocación de la nueva tubería, etc., sería no menor de $100,000.00.

Los anteriores hechos demuestran que la acción tomada por el tribunal de instancia al declarar con lugar la solicitud de *injunction* es sumamente drástica. La demandada sintetiza su contención así:

".  .  . (1) que la estación de bomba envuelta en el recurso, fue localizada debidamente según estudios técnicos efectuados por peritos del Gobierno; (2) que rinde un servicio público a una comunidad compuesta por 295 familias incluyendo a los demandantes-recurridos; (3) que solamente dichos demandantes,

una sola familia, por haber adquirido su residencia en los dos únicos solares colindantes con dicha estación de bomba y con conocimiento previo de su existencia, son los únicos que son afectados; (4) que la perturbación es leve, no es persistente ni constante; (5) que el 'injunction' que ordena la remoción de dicha estación de bomba es drástico por los daños incalculables que se le ocasionarían a la demandada-recurrente; (6) que en cualquier otro sitio en que pudiera localizarse la estación de bomba se produciría la misma situación afectándose a otros residentes de la misma urbanización; (7) que existen otros medios para aminorar y quizás hacer que cesen por completo las molestias e inconvenientes que ahora alegan estar sufriendo los demandantes-recurridos como sería relocalizar los registros fuera del área de la caseta de bombas, lo que podría hacerse a un costo insignificante comparado con el costo extraordinario de remover la estación de bombas del sitio en que se encuentra." (Pág. 6 Memorando demandada.)

Aunque la perturbación de los derechos de los demandantes no fuera leve, aun así habría que considerar el balance de derechos y equidades envueltos en el caso, antes de adoptar la drástica determinación hecha por el tribunal de instancia. (²)

Si existen otros medios para eliminar o disminuir considerablemente los malos olores de que se quejan los demandantes, tales como la relocalización de los registros fuera del área de la caseta de bombas, según apunta la demandada, la sentencia de *injunction* debió limitarse a ordenar a la demandada para que en un término razonable realice las obras o reformas razonables y adecuadas para eliminar o aminorar la perturbación que causan los malos olores. *Arcelay* v. *Sánchez*, 77 D.P.R. 824 (1955).

Por los motivos expuestos, *la sentencia del Tribunal Superior, Sala de Ponce, debe ser revocada en tanto en cuanto*

---

(²) Véanse, 66 C.J.S. § 118; Lewis & Spelling, *The Law of Injunction* § 295, pág. 594; 40 A.L.R.2d pág. 1187; *Fields Sewerage Co.* v. *Bishop*, 30 S.W.2d 112; *Valparaiso* v. *Hagen*, 54 N.E. 1062; *Elliot Nursery Co.* v. *Duquesne Light Co.*, 281 Pa. 166; 39 Am. Jur. 161.

*ordena a la demandada-recurrente que remueva la bomba de alcantarillado localizada al lado de la casa de los demandantes, devolviéndose el caso para que dicho Tribunal emita una nueva orden en armonía con los términos de esta decisión.* [3] *En cuanto al pronunciamiento condenando a la demandada a resarcir los daños y perjuicios sufridos por los demandantes, se confirmará dicha sentencia.*

El Juez Presidente Señor Negrón Fernández, no intervino.

[3] Véase, *Casiano Sales* v. *Lozada Torres*, 91 D.P.R. 488 (1964).